In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1687 & 10-2442

DONALD VANCE and NATHAN ERTEL,

*Plaintiffs-Appellees,*

*v.*

DONALD RUMSFELD and
THE UNITED STATES OF AMERICA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6964—**Wayne R. Andersen**, *Judge.*

ARGUED FEBRUARY 10, 2011—DECIDED AUGUST 8, 2011

Before MANION, EVANS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal raises funda-
mental questions about the relationship between the
citizens of our country and their government. Plaintiffs
Donald Vance and Nathan Ertel are American citizens
and civilians. Their complaint alleges in detail that they
were detained and illegally tortured by U.S. military

personnel in Iraq in 2006. Plaintiffs were released from military custody without ever being charged with a crime. They then filed this suit for violations of their constitutional rights against former Secretary of Defense Donald Rumsfeld and other unknown defendants under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs seek damages from Secretary Rumsfeld and others for their roles in creating and carrying out policies that caused plaintiffs' alleged torture. Plaintiffs also bring a claim against the United States under the Administrative Procedure Act to recover personal property that was seized when they were detained.

Secretary Rumsfeld and the United States moved to dismiss the claims against them. The district court denied in part Secretary Rumsfeld's motion to dismiss, allowing plaintiffs to proceed with *Bivens* claims for torture and cruel, inhuman, and degrading treatment, which have been presented as Fifth Amendment substantive due process claims. *Vance v. Rumsfeld*, 694 F. Supp. 2d 957 (N.D. Ill. 2010). The district court also denied the government's motion to dismiss the plaintiffs' property claim. *Vance v. Rumsfeld*, 2009 WL 2252258 (N.D. Ill. 2009). Secretary Rumsfeld and the United States have appealed, and we consider their appeals pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 1292(b).

We agree with the district court that the plaintiffs may proceed with their *Bivens* claims against Secretary Rumsfeld. Taking the issues in ascending order of breadth, we agree first, applying the standards of Federal Rule

of Civil Procedure 12(b)(6), that plaintiffs have alleged in sufficient detail facts supporting Secretary Rumsfeld's personal responsibility for the alleged torture. Second, we agree with the district court that Secretary Rumsfeld is not entitled to qualified immunity on the pleadings. The law was clearly established in 2006 that the treatment plaintiffs have alleged was unconstitutional. No reasonable public official could have believed otherwise.

Next, we agree with the district court that a *Bivens* remedy is available for the alleged torture of civilian U.S. citizens by U.S. military personnel in a war zone. We see no persuasive justification in the *Bivens* case law or otherwise for defendants' most sweeping argument, which would deprive civilian U.S. citizens of a civil judicial remedy for torture or even cold-blooded murder by federal officials and soldiers, at any level, in a war zone. United States law provides a civil damages remedy for aliens who are tortured by their own governments. It would be startling and unprecedented to conclude that the United States would not provide such a remedy to its own citizens.

The defendants rely on two circuit decisions denying *Bivens* remedies to alien detainees alleging that U.S. officials caused them to be tortured, one case arising from war zones, *Ali v. Rumsfeld*, ___ F.3d ___, 2011 WL 2462851 (D.C. Cir. June 21, 2011) (detainees in Iraq and Afghanistan), and the other as part of the war on terror, *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc) ("extraordinary rendition" case). Those claims by aliens are readily distinguishable from this case based on the different circumstances of aliens and civilian U.S. citi-

zens. Whether or not one agrees with those decisions, the difficult issues posed by aliens' claims should not lead courts to extend the reasoning in those cases to deny all civil remedies to civilian U.S. citizens who have been tortured by their own government, in violation of the most fundamental guarantees in the constitutional pact between citizens and our government.

As to the modest property claim against the United States, however, we agree with the government that the Administrative Procedure Act's "military authority" exception precludes judicial review of military actions affecting personal property in a war zone, and we reverse the district court's decision on that claim.

I. *Factual and Procedural Background*

A. *Factual Allegations*

Plaintiffs Donald Vance and Nathan Ertel have alleged sobering claims that they were tortured by U.S. military personnel while they were detained indefinitely at Camp Cropper, a U.S. military prison in Iraq in 2006, during the ongoing Iraq War.[1] Because this case comes before us

---

[1] The amicus brief filed by former Secretaries of Defense and former Members of the Joint Chiefs of Staff in support of Secretary Rumsfeld and the government points out that the United States technically operated in Iraq through 2008 as part of the Multinational Force — Iraq ("MNF-I"). We assume that the forces holding Vance and Ertel were under the authority of the United States. Like the amici, we refer to the

(continued...)

from the denial of a motion to dismiss, we assume the truth of all well-pled allegations in the complaint, viewing those allegations in the light most favorable to the plaintiffs. See *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d 416, 421 (7th Cir. 2010), citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). We do not vouch for the truth of the allegations. By seeking dismissal under Rule 12(b)(6), however, the defendants have asked us to decide the issues based on the assumption that the allegations are true. We proceed on that basis.

We can only summarize here the key allegations in the detailed Complaint, with its 79 pages and 387 paragraphs, citing the pertinent paragraph numbers.[2] Vance and Ertel, two young American civilians, independently moved from their homes in Illinois and Virginia to work in Iraq to help "rebuild the country and achieve democracy" following the beginning of the current conflict there. See ¶¶ 3, 28. In 2005 and 2006, before their detention, the two Americans worked for a privately-owned Iraqi security services company, Shield Group Security, in the "Red Zone" in Iraq, the area outside the secure "Green Zone" in Baghdad. ¶¶ 33-39. Over time, Vance became suspicious that the company was involved with corruption and other illegal activity. ¶¶ 18, 42. He noticed, for example, that Shield Group Security

---

[1] (...continued)
forces who detained the plaintiffs as the "U.S. military," not the "MNF-I."

[2] All references to the Complaint are to the operative pleading, the Second Amended Complaint.

officials were making payments to Iraqi sheikhs, which he believed was done to obtain influence. ¶¶ 41-42. While Vance was home in Chicago for his father's funeral, he contacted U.S. government officials to report his suspicions. ¶ 43. He met with an FBI agent, who arranged for Vance to continue reporting suspicious activity back to Chicago. The FBI agent also requested that Vance meet U.S. government officials in Iraq to report his observations. ¶¶ 44-47, 49. Vance told his friend and colleague Ertel that he had become an informant, and Ertel contributed information as well. ¶¶ 48-49.

The plaintiffs were frequently in touch with their government contacts, sometimes multiple times a day. ¶ 45. At the request of a U.S. government official in Iraq, Vance copied and shared Shield Group Security documents with U.S. officials. ¶ 47. Vance and Ertel reported their in-depth observations of individuals closely associated with Shield Group Security, including U.S. and Iraqi government officials who were involved with illegal arms trading, stockpiling of weapons, bribery, and other suspicious activity and relationships. ¶¶ 45-104. Their whistleblowing allegedly included the sharing of sensitive information with the U.S. government, including reports that their supervisor, who called himself the "Director" of the "Beer for Bullets" program, traded liquor to American soldiers in exchange for U.S. weapons and ammunition that Shield Group Security then used or sold for a profit. ¶ 95.

Shield Group Security officials became suspicious about the plaintiffs' loyalty to the firm. On April 14, 2006, they confiscated the credentials that allowed plaintiffs

access to the Green Zone, effectively trapping them inside the firm's compound in the Red Zone. ¶¶ 107-12, 116-19. Plaintiffs called their U.S. government contacts in Iraq for help. They were told that they should interpret Shield Group Security's actions as taking them hostage, and should barricade themselves with weapons in a room of the compound. ¶¶ 120, 124-25. They were assured that U.S. forces would come to rescue them. ¶ 124. U.S. forces came to the compound and took Vance and Ertel to the U.S. Embassy for questioning. ¶¶ 125-31. Military personnel seized all of their personal property, including laptop computers, cell phones, and cameras. ¶ 127. The plaintiffs shared information about Shield Group Security transactions and were sent to a trailer to sleep. ¶¶ 130-31.

After two or three hours of sleep, Vance and Ertel, who were under the impression that they had been rescued by their government, were in for a shock. They were awakened and arrested, handcuffed, blindfolded, and driven to Camp Prosperity, a U.S. military compound in Baghdad. ¶¶ 131, 138-39. There, plaintiffs allege, they were placed in a cage, strip-searched, fingerprinted, and issued jumpsuits. ¶ 140. They were instructed to keep their chins to their chests and not to speak. They were threatened that if they did speak, they would have "excessive force" inflicted on them. ¶ 141. Vance and Ertel were then taken to separate cells and held in solitary confinement for what they believe was two days. ¶¶ 142-43.

For those two days, the plaintiffs were held incommunicado in their cells, and were not permitted to

contact their families or lawyers. They were fed twice a day and allowed to go to the bathroom twice a day. They each had a thin mat on concrete on which to sleep, but the lights were kept on 24 hours a day. ¶¶ 142, 161. After two days, Vance and Ertel were shackled, blindfolded, and transported to Camp Cropper, a U.S. military facility near Baghdad International Airport. ¶¶ 143-44.

After the plaintiffs were taken to Camp Cropper, they experienced a nightmarish scene in which they were detained incommunicado, in solitary confinement, and subjected to physical and psychological torture for the duration of their imprisonment — Vance for three months and Ertel for six weeks. ¶¶ 2, 20-21, 146-76, 212. They allege that all of the abuse they endured in those weeks was inflicted by Americans, some military officials and some civilian officials. ¶ 21. They allege that the torture they experienced was of the kind "supposedly reserved for terrorists and so-called enemy combatants." ¶ 2. If the plaintiffs' allegations are true, two young American civilians were trying to do the right thing by becoming whistleblowers to the U.S. government, but found themselves detained in prison and tortured by their own government, without notice to their families and with no sign of when the harsh physical and psychological abuse would end. ¶¶ 1-4, 19, 21, 52-54, 161.[3]

---

[3] The plaintiffs were informed that they were being held as "security internees" because they worked for a business that

(continued...)

Vance and Ertel allege that after they arrived at Camp Cropper they were strip-searched while still blind-folded, and issued jumpsuits. ¶ 145. They were then held in solitary confinement, in small, cold, dirty cells and subjected to torturous techniques forbidden by the Army Field Manual and the Detainee Treatment Act. ¶¶ 146, 217-18, 242-44, 265. The lights were kept on at all times in their cells, so that the plaintiffs experienced "no darkness day after day" for the entire duration of their time at Camp Cropper. ¶¶ 21, 147. Their cells were kept intolerably cold, except when the generators failed. *Id*. There were bugs and feces on the walls of the cells, in which they spent most of their time in complete isolation. ¶ 146. Vance and Ertel were driven to exhaustion; each had a concrete slab for a bed, but guards would wake them if they were ever caught sleeping. ¶¶ 148, 149. Heavy metal and country music was pumped into their cells at "intolerably-loud volumes," and they were deprived of mental stimulus. ¶¶ 21, 146, 149. The plaintiffs each had only one shirt and a pair of overalls to wear during their confinement. ¶ 152. They were often deprived of food and water

---

[3] (...continued)
possessed large weapons caches and that might be involved in distributing weapons to insurgent and terrorist groups. ¶¶ 179-80. The plaintiffs adamantly deny any wrongdoing and allege that the U.S. government officials in Iraq fabricated these allegations, for which they were never charged, in retaliation for their whistleblowing of "high-value information" that could reflect poorly on U.S. officials in Iraq. ¶¶ 1, 4, 132.

and repeatedly deprived of necessary medical care. ¶¶ 151, 153-55.

Beyond the sleep deprivation and the harsh and isolating conditions of their detention, plaintiffs allege, they were physically threatened, abused, and assaulted by the anonymous U.S. officials working as guards. ¶ 157. They allege, for example, that they experienced "hooding" and were "walled," *i.e.*, slammed into walls while being led blindfolded with towels placed over their heads to interrogation sessions. ¶¶ 21, 157. Plaintiffs also claim that they were continuously tormented by the guards, who would conduct shake-downs of their cells, sometimes on the false premise that they had discovered contraband, and who seemed intent on keeping them off-balance mentally. ¶ 156.

The constant theme of the aggressive interrogations was a haunting one — if Vance and Ertel did not "do the right thing," they would never be allowed to leave Camp Cropper. ¶ 176. Vance and Ertel were not only interrogated but continuously threatened by guards who said they would use "excessive force" against them if they did not immediately and correctly comply with instructions. ¶ 158. The plaintiffs allege that this treatment lasted for the duration of their detention at Camp Cropper. ¶¶ 2, 165, 176.

While Vance and Ertel were detained and interrogated, their loved ones did not know whether they were alive or dead. ¶¶ 1, 161. Eventually, Vance and Ertel were allowed a few telephone calls to their families but were not allowed to disclose their location or anything about

the conditions of their detention or the nature of their interrogations. ¶ 162. When they were not being interrogated, they were held in almost constant solitary confinement. Vance's requests for clergy visits were denied, and plaintiffs were forbidden to correspond with a lawyer or a court. ¶¶ 163-64.

Vance and Ertel were never charged with any crime or other wrongdoing, nor were they designated as security threats. ¶¶ 1, 212, 214. Instead, both were eventually released and dropped off at the airport in Baghdad to find their way home. ¶¶ 208, 210. Vance and Ertel both allege that they were devastated physically and emotionally by what they endured at the hands of their own government. ¶ 213.

B. *Procedural History*

Following their release, the plaintiffs sued former Secretary of Defense Donald Rumsfeld, in his individual capacity, as well as unidentified defendants.[4] The

---

[4] Plaintiffs explained in oral argument that they were limited in identifying other defendants given the nature of their detention in a "sterilized system." No name tags were worn by Camp Cropper officials, and the American guards had code names for each other. The magistrate judge ordered some discovery so the plaintiffs could identify other defendants. See Memorandum Opinion and Order, Dkt. No. 89 (Dec. 21, 2007) (ordering limited discovery for plaintiffs to learn identities of unknown defendants responsible for their

(continued...)

plaintiffs also brought a claim against the United States to recover the personal property seized from them at the time they were taken into custody.

Secretary Rumsfeld and the United States moved to dismiss all claims against them. The district court dismissed plaintiffs' claims against Secretary Rumsfeld for denial of procedural due process (Count II) and denial of access to the courts (Count III), but declined to dismiss their claim that their treatment amounted to unconstitutional cruel, inhuman, and degrading treatment (Count I). The district court concluded that plaintiffs had sufficiently pled Secretary Rumsfeld's personal responsibility for their alleged treatment and that Secretary Rumsfeld was not protected by qualified immunity. The district court also rejected the defendants' argument that "special factors" preclude the recognition of a *Bivens* remedy for torture of civilian U.S. citizens in a war zone. In a separate order, the district court denied the United States' motion to dismiss the plaintiffs' personal property claim.

These matters are now before us in two separate appeals. The district court's rejection of a defendant's quali-

---

[4] (...continued)
detention and alleged mistreatment); Minute Entry (Order on Motion to Compel), Dkt. No. 267 (Jun. 14, 2010) (granting plaintiffs' motion to compel discovery). But the district court later granted the government's motion to stay proceedings, including pending discovery requests to identify unknown defendants, during this appeal. See Minute Entry (Order on Motion to Stay), Dkt. No. 285 (Nov. 17, 2010).

fied immunity defense is considered a final judgment subject to immediate appeal, so we have jurisdiction over Secretary Rumsfeld's appeal, docketed as No. 10-1687, pursuant to the general appellate jurisdiction statute, 28 U.S.C. § 1291. See *Behrens v. Pelletier*, 516 U.S. 299, 301 (1996), citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985). The broader *Bivens* issue is "directly implicated by the defense of qualified immunity" and is thus also properly before us. *Wilkie v. Robbins*, 551 U.S. 537, 550 n.4 (2007), quoting *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006). We have jurisdiction over the United States' appeal on the property issue, docketed as No. 10-2442, because the district court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). We have consolidated the appeals for disposition.

## II. *Analysis*

We affirm the district court's decision on the *Bivens* claims in No. 10-1687, concluding in this sequence, from the narrowest issue to the broadest: (a) that plaintiffs adequately alleged Secretary Rumsfeld's personal responsibility for their treatment, as required under *Bivens*; (b) that Secretary Rumsfeld is not entitled to qualified immunity on the defense theory that a reasonable government official could have believed in 2006 that the abuse plaintiffs have alleged was not unconstitutional; and (c) that a *Bivens* remedy should be available to civilian U.S. citizens in a war zone, at least for claims of torture or worse. We reverse the district court's decision in No. 10-2442, concluding that the district court

should have dismissed the plaintiffs' property claims under the "military authority" exception to the Administrative Procedure Act.

A. *Personal Responsibility*

To proceed with their *Bivens* claims, plaintiffs must allege facts indicating that Secretary Rumsfeld was personally involved in and responsible for the alleged constitutional violations. See *Iqbal*, 129 S. Ct. at 1948-49; *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. As the Supreme Court said in *Iqbal*, "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id*. Unlike in *Iqbal*, which was a discrimination case, where the plaintiff was required to plead that the defendant acted with discriminatory purpose, the minimum knowledge and intent required here would be deliberate indifference, as in analogous cases involving prison and school officials in domestic settings. See *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (finding that a prison official acts with "deliberate indifference" if the "official acted or failed to act despite his knowledge of a substantial risk of serious harm"); *T.E. v. Grindle*, 599 F.3d 583, 591 (7th Cir. 2010) ("When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution,

regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm.").[5]

---

[5] The defendants rely heavily on *Iqbal*, but the case is clearly distinguishable because of the nature of the alleged constitutional violations. The issue in *Iqbal* was not what the defendants (Attorney General Ashcroft and FBI Director Mueller) actually did, but their subjective purposes — whether they acted on the basis of religious or ethnic bias or instead acted to fight terrorism. The plaintiff alleged that the Attorney General and the FBI Director had established and implemented policies following the attacks of September 11, 2001 that led to the detention of the plaintiff under harsh conditions separate from the general prison population, allegedly because of a policy that kept prisoners separate because of their race, religion, or national origin. Because there was a legitimate explanation for the policy — the "nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist attacks" — the Court held that personal responsibility was not pled sufficiently where the complaint provided no plausible basis for rejecting that legitimate explanation. *Iqbal*, 129 S. Ct. at 1951-52. In this case, by contrast, the inquiry before us is whether the plaintiffs have pled sufficiently that defendant Secretary Rumsfeld personally established the relevant policies that authorized the unconstitutional torture they allege they suffered. *Iqbal* did not disturb the *Bivens* and section 1983 principles holding that a supervisor may be liable as an individual for wrongs he personally directed or authorized his subordinates to inflict.

(continued...)

In arguing that the district court erred in holding that
qualified immunity does not protect Secretary Rumsfeld
from liability, the defendants blend both the issue of
Secretary Rumsfeld's personal responsibility for plain-
tiffs' treatment and the doctrine of qualified immunity.
These issues are actually quite distinct, and we treat
them separately. We begin by addressing the defendants'
personal responsibility arguments, which are primarily
about whether the plaintiffs have pled a sufficient level
of detail about Secretary Rumsfeld's personal responsibil-
ity to survive a motion to dismiss under Rule 12(b)(6)
of the Federal Rules of Civil Procedure. We first examine
the applicable pleading requirements. We then sum-
marize the detailed allegations of Secretary Rumsfeld's
personal responsibility from the Complaint. Finally, we
address the defendants' specific concerns about the
Complaint.

We conclude that the plaintiffs have sufficiently
alleged Secretary Rumsfeld's personal responsibility.
While it may be unusual that such a high-level official
would be personally responsible for the treatment of

---

[5] (...continued)

A similar distinction applies to the Supreme Court's recent
decision in *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011). There the
Supreme Court held that where the plaintiff's seizure under
the federal material witness statute was objectively reason-
able, the plaintiff could not pursue a *Bivens* claim on the
theory that the seizure was pretextual, based in fact on a
different and unconstitutional subjective purpose. See *id.*
at 2082-83.

detainees, here we are addressing an unusual situation where issues concerning harsh interrogation techniques and detention policies were decided, at least as the plaintiffs have pled, at the highest levels of the federal government. We conclude that plaintiffs have sufficiently alleged that Secretary Rumsfeld acted deliberately in authorizing interrogation techniques that amount to torture. (Whether he actually did so remains to be seen.) We differ with the district court in one respect, though. We think that the plaintiffs' pleadings, if true, have sufficiently alleged not only Secretary Rumsfeld's personal responsibility in creating the policies that led to the plaintiffs' treatment but also deliberate indifference by Secretary Rumsfeld in failing to act to stop the torture of these detainees despite actual knowledge of reports of detainee abuse.

1. *Applicable Pleading Requirements*

The Federal Rules of Civil Procedure impose no special pleading requirements for *Bivens* claims, including those against former high-ranking government officials. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002). The notice pleading standard under Rule 8 of the Federal Rules of Civil Procedure applies, and a plaintiff is required to provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The complaint will survive a motion to dismiss if it meets the "plausibility" standard applied in *Iqbal* and *Twombly*. See *Iqbal*, 129 S. Ct. at 1949, quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007) (holding that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

These pleading rules are meant to "'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009), quoting *Swierkiewicz*, 534 U.S. at 514. At the same time, "a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail . . . to indicate that the plaintiff has a substantial case." *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 802-03 (7th Cir. 2008). We agree with the district court's observation in this case: "*Iqbal* undoubtedly requires vigilance on our part to ensure that claims which do not state a plausible claim for relief are not allowed to occupy the time of high-ranking government officials. It is not, however, a categorical bar on claims against these officials." *Vance*, 694 F. Supp. 2d at 961. "When a plaintiff presents well-pleaded factual allegations sufficient to raise a right to relief above a speculative level, that plaintiff is entitled to have his claim survive a motion to dismiss even if one of the defendants is a high-ranking government official." *Id*.

2. *The Complaint*

We agree with the district court that the plaintiffs have alleged sufficient facts to show that Secretary Rumsfeld personally established the relevant policies that caused the alleged violations of their constitutional rights during detention. The detailed Complaint provided Secretary Rumsfeld sufficient notice of the claims against him and stated plausible claims that satisfy Rule 8 and *Iqbal* and *Twombly*.

The plaintiffs allege that Secretary Rumsfeld devised and authorized policies that permit the use of torture in their interrogation and detention. ¶ 217. They claim that he was "personally responsible for developing, authorizing, supervising, implementing, auditing and/or reforming the policies, patterns or practices governing the . . . treatment . . . [and] interrogation . . . of detainees." ¶ 26. Specifically, they allege that in 2002, Secretary Rumsfeld "personally approved a list of torturous inter-rogation techniques for use on detainees" at Guantanamo Bay that, "[c]ontrary to . . . the then-governing Army Field Manual 34-52 . . . included the use of 20-hour inter-rogations, isolation for up to 30 days, and sensory dep-rivation." ¶ 232. In 2003, Secretary Rumsfeld allegedly "rescinded his formal authorization to use those techniques generally, but took no measures to end the practices which had by then become ingrained, nor to confirm that the practices were in fact . . . terminated." ¶ 233. Instead, he authorized the use of techniques outside of the Army Field Manual if he personally ap-proved them. *Id*. The plaintiffs also allege that in 2003,

Secretary Rumsfeld approved a new set of policies that included isolation for up to 30 days, dietary manipulation, and sleep deprivation (the "2003 List"). ¶ 234. In addition to these formal policies, Secretary Rumsfeld also authorized additional harsh techniques if he approved them in advance. ¶ 235.

The plaintiffs allege that Secretary Rumsfeld then directed that the techniques in place at Guantanamo Bay also be extended to Iraq. ¶¶ 235-39. The plaintiffs claim, for instance, that Secretary Rumsfeld sent Major General Geoffrey Miller to Iraq in August 2003 to evaluate how prisons could gain more "actionable intelligence" from detainees. ¶ 236. In September 2003, in response to General Miller's suggestion to use more aggressive interrogation policies in Iraq, and as allegedly "directed, approved and sanctioned" by Secretary Rumsfeld, the commander of the United States-led military coalition in Iraq signed a memorandum authorizing the use of 29 interrogation techniques (the "Iraq List"), which included sensory deprivation, light control, and the use of loud music. ¶ 238.[6] The commander later modified

---

[6] The plaintiffs elaborate on the September 2003 policy in their brief, noting that the Senate Armed Services Committee reported that this list "drew heavily" on Secretary Rumsfeld's guidance for Guantanamo Bay. See *Inquiry Into The Treatment of Detainees in U.S. Custody*, Committee on Armed Services (Nov. 20, 2008), available at http://www.armed-services.senate.gov/ Publications/Detainee Report Final_April 22 2009.pdf (last accessed Aug. 4, 2011). "According to LTG Sanchez, the Septem-
(continued...)

the memorandum, but interrogators were still given discretion to subject detainees to interrogation methods involving manipulation of lighting, heating, food, shelter, and clothing of the detainees. ¶ 239.

The plaintiffs also allege that Secretary Rumsfeld was well aware of detainee abuse because of both public and internal reports documenting the abuse. ¶¶ 240-41, 252. In May 2003, the International Red Cross began reporting on the abuse of detainees in U.S. custody in Iraq. ¶ 240. The plaintiffs allege that then-Secretary of State Colin Powell confirmed that Secretary Rumsfeld knew of the reports of abuse and regularly reported them to President Bush throughout 2003. *Id*. They also

---

[6] (...continued)
ber 14, 2003 policy 'drew heavily' on the Secretary of Defense's April 16, 2003 guidance for GTMO." *Id*. at 201. A party whose pleading is being attacked on appeal under Rule 12(b)(6) may elaborate on his allegations so long as the elaborations are consistent with the pleading. See *Chavez v. Illinois State Police*, 251 F.3d 612, 650 (7th Cir. 2001); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439-40 (7th Cir. 1994) (reversing dismissal in relevant part based on such new elaborations); *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992) (reversing dismissal based on new elaborations). If a party can win reversal with such new elaborations on its pleadings, then these plaintiffs can defend the denial of the motion to dismiss in the same way. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146-47 (7th Cir. 2010) (concluding after *Iqbal* and *Twombly* that plaintiffs may still suggest facts outside of the pleadings to show that their complaints should not be dismissed).

allege that Secretary Rumsfeld also knew of other investigative reports into detainee abuse in Iraq, including a report by former Secretary of Defense James Schlesinger. ¶ 241.[7]

Congress took action in response to allegations of detainee abuse. ¶ 14. First, Congress passed the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, which reaffirmed the U.S. prohibition against torture techniques that violate the United States Constitution and the Geneva Conventions. Pl. Br. at 7. The law instructed then-Secretary Rumsfeld to take action to stop abusive interrogation techniques:

> The Secretary of Defense shall ensure that policies are prescribed not later than 150 days after the date of the enactment . . . to ensure that members of the Armed Forces, and all persons acting . . . within facilities of the Armed Forces, treat persons detained by the United States Government in a humane manner consistent with the international obligations and

---

[7] The plaintiffs elaborate on this point in their brief, citing the Final Report of the Independent Panel to Review DoD Detention Operations (Aug. 24, 2004), available at http://www.defense.gov/news/Aug2004/d20040824finalreport.pdf (last accessed Aug. 4, 2011). This report, addressed from former Secretary of Defense Schlesinger to Secretary Rumsfeld, noted that "the changes in DoD interrogation policies . . . were an element contributing to uncertainties in the field as to which techniques were authorized" and that "the augmented techniques for Guantanamo migrated to . . . Iraq where they were neither limited nor safeguarded." *Id.* at 14.

laws of the United States and the policies set forth in section 1091(b).

Pub. L. No. 108-375, § 1092, 118 Stat. 1811, 2069-70 (2004), codified at 10 U.S.C. § 801, stat. note § 1092. The plaintiffs argue that, despite that specific direction from Congress, Secretary Rumsfeld took no action to rescind unauthorized interrogation methods before the plaintiffs were released from custody in 2006. ¶¶ 244, 252.

In 2005, Congress enacted the Detainee Treatment Act, which limited allowable interrogation techniques to those authorized in the Army Field Manual, thus specifically outlawing the interrogation techniques that Secretary Rumsfeld had earlier authorized, and which the plaintiffs allege in detail they suffered at the hands of U.S. military personnel in 2006. ¶¶ 242-43. The Detainee Treatment Act stated in relevant part:

> No person in the custody or under the effective control of the Department of Defense or under detention in a Department of Defense facility shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation.

Pub. L. 109-148, § 1002(a), 119 Stat. 2680, 2739 (2005), codified at 10 U.S.C. § 801, stat. note § 1002.

The plaintiffs contend that, after the enactment of the Detainee Treatment Act, Secretary Rumsfeld continued to condone the use of techniques from outside the Army Field Manual. ¶ 244. They allege that on the same day that Congress passed the Detainee Treatment Act

in December 2005, Secretary Rumsfeld added ten
classified pages to the Field Manual, which included
cruel, inhuman, and degrading techniques, such as those
allegedly used on the plaintiffs (the plaintiffs refer to
this as "the December Field Manual"). *Id*. The defendants
describe this allegation as speculative and untrue, but
we must accept these well-pled allegations as true at
the Rule 12(b)(6) stage of the proceedings.[8]

The plaintiffs also claim that Secretary Rumsfeld, in
the face of both internal reports and well-publicized
accusations of detainee mistreatment and torture by
U.S. forces in Iraq, did not investigate or correct the

---

[8] On appeal, the plaintiffs cite a newspaper article reporting on
the development of this classified set of interrogation methods.
See Eric Schmitt, "New Army Rules May Snarl Talks with
McCain on Detainee Issue," *New York Times* (Dec. 14,
2005), available at http://www.nytimes.com/2005/12/14/politics/
14detain.html (last accessed Aug. 4, 2011) ("The Army has
approved a new, classified set of interrogation methods . . .
The techniques are included in a 10-page classified
addendum to a new Army field manual . . ."). The plaintiffs
contend that Secretary Rumsfeld eventually abandoned efforts
to classify the Field Manual, but that the "December Field
Manual" was in operation during their detention and was not
replaced until September 2006, after plaintiffs had been
released, when a new field manual (Field Manual 2-22.3) was
instituted. ¶ 244; Pl. Br. at 11. The dissent criticizes plaintiffs'
reliance on the newspaper report, but plaintiffs' case for
personal responsibility rests on allegations that are far more
extensive. In any event, these are disputes of fact that cannot
be resolved by a Rule 12(b)(6) motion.

abuses, despite his actual knowledge that U.S. citizens were being and would be detained and interrogated using the unconstitutional abusive practices that he had earlier authorized. ¶ 252. The plaintiffs allege that reports of the abusive treatment of detainees by the U.S. military were widely reported by Amnesty International, the United Nations Assistance Mission for Iraq, and the International Committee of the Red Cross. ¶¶ 245-51. The plaintiffs contend that Secretary Rumsfeld was the "official responsible for terminating this pattern of abuse and reforming the policies causing it." ¶ 252. Instead, the plaintiffs allege, Secretary Rumsfeld took no action because "this conduct was being carried out pursuant to the interrogation and detention policies [he] himself created and implemented." *Id*.

3. *Secretary Rumsfeld's Personal Responsibility is Pled Sufficiently*

We see no deficiency in the Complaint that would warrant dismissal on the issue of personal responsibility. Taking the factual allegations in the complaint as true, as we must, the plaintiffs have pled facts showing that it is plausible, and not merely speculative, that Secretary Rumsfeld was personally responsible for creating the policies that caused the alleged unconstitutional torture. The Complaint also alleges that the Secretary was responsible for not conforming the treatment of the detainees to the standards set forth in the Detainee Treatment Act. Congress specifically ordered the Secretary to "ensure" that detainees in custody of the United

States were treated in a "humane manner consistent with the international obligations and laws of the United States." See Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, 10 U.S.C. § 801, stat. note § 1092.[9]

The plaintiffs have adequately pled the "kind of active and intentional disregard for their treatment" that the defendants suggest "would be necessary to establish liability." First, while Secretary Rumsfeld did not personally carry out the alleged violations of plaintiffs' constitutional rights, the plaintiffs have alleged that he personally created the policies that authorized and led to their torture. If adequately pled, that is sufficient at this stage to allege personal involvement. See, *e.g.*, *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002) (finding under 42 U.S.C. § 1983 that allegations that agency's most senior officials were personally "responsible for creating the policies, practices and customs that caused the constitutional deprivations . . . suffice at this stage in the litigation to demonstrate . . . personal involvement in [the] purported unconstitutional conduct"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998)

---

[9]  To be clear, we read the Complaint as asserting claims arising under the United States Constitution, not the Detainee Treatment Act, which does not provide for a private right of action. The Detainee Treatment Act and the Secretary's responsibilities in executing it are relevant in evaluating the Secretary's knowledge of and responsibility for the treatment of detainees.

(finding that a warden is "not liable for an isolated failure of his subordinates to carry out prison policies, however — unless the subordinates are acting (or failing to act) on the warden's instructions"); see also Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses*, § 7.19[C], at 7-239 (4th ed. 2010) (noting that "supervisory officials who promulgate policies that are enforced by subordinates are liable if the enforcement of the policy causes a violation of federally protected rights"); *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (concluding after *Iqbal* that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which" subjects plaintiffs to constitutional violations); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (concluding that supervisory liability under § 1983 may be shown, inter alia, by "creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue.").

Second, the plaintiffs have adequately alleged that Secretary Rumsfeld acted with deliberate indifference by not ensuring that the detainees were treated in a humane manner despite his knowledge of widespread detainee mistreatment. See *Farmer*, 511 U.S. at 842 (concluding that it is sufficient if a plaintiff bringing an Eighth Amendment claim shows that the "official acted or failed to act despite his knowledge of a substantial

risk of serious harm"); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citations omitted) ("Simply put, an official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'"). The plaintiffs have plausibly alleged Secretary Rumsfeld's personal responsibility on this theory.

Finally, we reject the defendants' argument that plaintiffs' claims rest on "naked assertions" of illegal conduct without factual development. The defendants seek to poke holes in a number of the plaintiffs' allegations, but we do not find their arguments convincing, at least at the pleading stage under Rule 12(b)(6). The defendants argue that the plaintiffs' only "concrete allegations" about detention and interrogation policies relate to policies that did not even apply to U.S. citizens in Iraq, and were, in any case, rescinded before the plaintiffs were detained. We are not persuaded by this argument. The plaintiffs have adequately alleged that Secretary Rumsfeld was responsible for creating policies that governed the treatment of the detainees in Iraq and for not conforming the treatment of the detainees in Iraq to the Detainee Treatment Act.

We also are not persuaded by the defendants' argument that the Detainee Treatment Act superseded the policies described in the Complaint. This argument misunderstands the plaintiffs' point — that Secretary Rumsfeld's policies continued to condone the unconstitutional practices he had allegedly created even after Congress mandated otherwise. The plaintiffs' allegation that Secretary

Rumsfeld secretly sought to add permissible techniques to the Army Field Manual after Congress passed the Detainee Treatment Act is plausible and supports their broader allegation that Secretary Rumsfeld continued to promote and condone unconstitutional treatment of detainees. It remains to be seen whether plaintiffs can prove this, but they need not have done so yet.

The defendants also argue that the plaintiffs offer nothing to link the guards' threats of excessive force or the denial of medical care to a particular policy issued by Secretary Rumsfeld. Examining these particular allegations as part of the totality of allegations and the program for dealing so harshly with detainees, however, we think they are sufficiently pled to survive the motion to dismiss. With discovery of the identities of the individuals involved, we expect plaintiffs to refine their theories and their allegations concerning the defendants' individual responsibilities.

Finally, while a supervisor's mere "knowledge and acquiescence" is not sufficient to impose liability under *Iqbal*, 129 S. Ct. at 1949, we agree with the district court that outside documentation of detainee abuse, such as reports by international organizations, provides some support for the plausibility of plaintiffs' allegations. *Vance*, 694 F. Supp. 2d at 964; see also *al-Kidd v. Ashcroft*, 580 F.3d 949, 976 (9th Cir. 2009) (finding that complaint alleges facts that might support liability where it alleges that "'abuses occurring . . . were highly publicized in the media, congressional testimony and

correspondence, and in various reports by governmental and non-governmental entities,' which could have given [the defendant] sufficient notice to require affirmative acts to supervise and correct the actions of his subordinates"), *rev'd on other grounds*, 131 S. Ct. 2074 (2011). In sum, we hold that the plaintiffs have sufficiently and plausibly pled Secretary Rumsfeld's personal responsibility.

### B. *Qualified Immunity*

We now turn to whether qualified immunity protects Secretary Rumsfeld from liability. The qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Supreme Court explained in *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009), the doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." We review de novo the district court's decision denying a motion to dismiss on the basis of qualified immunity. *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001).

To resolve the qualified immunity defense, we use the two-step sequence that the Supreme Court articulated in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). We first

determine whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the [defendants'] conduct violated a constitutional right." *Id.* at 201. Second, we determine if the right was "clearly established" at the time of the relevant events. *Id*. While the Court has since decided that applying the *Saucier* test sequentially is not mandatory, it is still "often appropriate." *Pearson*, 129 S. Ct. at 818. See, *e.g.*, *al-Kidd*, 131 S. Ct. 2074 (deciding both constitutional merits and qualified immunity); *Hanes v. Zurick*, 578 F.3d 491 (7th Cir. 2009) (same). Here it makes sense to apply both steps of the *Saucier* test, just as the district court did.

We agree with the district court that plaintiffs have articulated facts that, if true, would show the violation of a clearly established constitutional right. In fact, the defendants' argument to the contrary evaporates upon review. The plaintiffs have pled that they were subjected to treatment that constituted torture by U.S. officials while in U.S. custody. On what conceivable basis could a U.S. public official possibly conclude that it was constitutional to torture U.S. citizens? See, *e.g.*, 18 U.S.C. § 2340A (statute criminalizing overseas torture); Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 113 (1984), at Art. 2 ("No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture."); *Siderman de Blake v. Republic*

*of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) (concluding that "it would be unthinkable to conclude other than that acts of official torture violate customary international law. And while not all customary international law carries with it the force of a *jus cogens* norm, the prohibition against official torture has attained that status").

The wrongdoing alleged here violates the most basic terms of the constitutional compact between our government and the citizens of this country. The defendants seem to agree, and go so far as to state:

> We do not argue that well-pled, factually-supported and concrete allegations of, for instance, persistent exposure to extreme cold, sustained failure to supply food and water, sustained sleep deprivation, and the failure to furnish essential medical care, if of sufficient severity and duration, would not state a violation of substantive due process in the context of military detention in a war zone.

Def. Br. 50. We concur with that view. Viewing the complaint in the light most favorable to the plaintiffs, as we must at this stage, this is exactly what the plaintiffs have pled. There can be no doubt that the deliberate infliction of such treatment on U.S. citizens, even in a war zone, is unconstitutional.

1. *The Alleged Abuse Violated a Constitutional Right*

If the plaintiffs' allegations of torture are true, there was

a violation of their constitutional right to substantive due process.[10] "Substantive due process involves the exercise

---

[10] The plaintiffs have presented and briefed their claim as a substantive due process claim under the Fifth Amendment. As the Supreme Court has held: "Due process requires that a pretrial detainee *not be punished*. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Bell v. Wolfish*, 441 U.S. 520, 537 n. 16 (1979) (emphasis added) (concluding that the court of appeals appropriately relied on the Due Process Clause rather than the Eighth Amendment in adjudicating the rights of pretrial detainees); see also *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977) (finding that "[w]here the state seeks to impose punishment without [an adjudication of guilt], the pertinent constitutional guarantee is the Due Process Clause"). The government suggests that the constitutional inquiry here requires this court to "wade into the murky waters of that most amorphous of constitutional doctrines, substantive due process." See *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005). As we have consistently said, however, "[t]he protections for pre-trial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner' . . . and we frequently consider the standards to be analogous." *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002), quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). We thus look to the case law for both substantive due process and the Eighth Amendment in examining the plaintiffs' claims. We are confident that the Framers meant to forbid abusive treatment of uncharged and unconvicted detainees where the same abusive treatment of a convicted prisoner would be prohibited.

of governmental power without reasonable justifica-
tion. . . . It is most often described as an abuse of govern-
ment power which 'shocks the conscience.'" *Tun*, 398 F. 3d
at 902, quoting *Rochin v. California*, 342 U.S. 165, 172 (1952).
The physical or mental torture of U.S. citizens, as the
district court concluded, is a paradigm of conduct that
"shocks the conscience." *Vance*, 694 F. Supp. 2d at 966.
The Supreme Court "has long held that certain inter-
rogation techniques, either in isolation or as applied to
the unique characteristics of a particular suspect, are
so offensive to a civilized system of justice that they
must be condemned under the Due Process Clause."
*Miller v. Fenton*, 474 U.S. 104, 109 (1985); see also *Wilkerson
v. Utah*, 99 U.S. 130, 136 (1878) (concluding that "it is
safe to affirm that punishments of torture . . . are
forbidden by . . . the Constitution"). The defendants do
not argue that the plaintiffs' allegations, if pled correctly,
do not amount to a violation of a constitutional right.
See Def. Br. at 50-51. Doing so would be futile.

The defendants instead argue that plaintiffs have
not alleged more than "vague, cursory, and conclusory
references to [their] conditions of confinement, without
sufficient factual information from which to evaluate
their constitutional claim." This argument, which is
more of a pleading argument to extend *Iqbal* and
*Twombly* than an argument about qualified immunity, is
not persuasive. The defendants argue, for example, that
while the plaintiffs allege that their cells were extremely
cold, they provide no "factual context, no elaboration,
no comparisons." At this stage of the case, we are

satisfied with the description of the cells as "extremely cold." Cf. Fed. R. Civ. P. 84 and Forms 10-15 (sample complaints that "illustrate the simplicity and brevity that these rules contemplate").

The defendants also suggest that the plaintiffs did not detail in their Complaint whether they sought and were denied warmer clothing or blankets. Even if it was not necessary, the plaintiffs actually specified the clothing and bedding that was available to each of them — a single jumpsuit and a thin plastic mat. The defendants also argue that plaintiffs did not specify how long they were deprived of sleep. That level of detail is not required at this stage, but a fair reading of this Complaint indicates that the sleep deprivation tactics were a constant for the duration of their detention, as was the physical and psychological abuse by prison officials.

As the defendants acknowledge, a substantive due process inquiry requires "an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements." See *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998) (reversing summary judgment for defendants). The plaintiffs have alleged sufficient details to conclude at this stage of the proceedings that, if true, their treatment, when considered in the aggregate, amounted to torture in violation of their right

to substantive due process.[11]

---

[11] The district court thought the Complaint was sufficient, and so do we. But even if we found some inadequacy in the details of the already detailed pleading, through an unusually vigorous extension of the *Iqbal* pleading standard, for example, plaintiffs would be entitled to an opportunity to amend their Complaint to remedy any perceived defects. Basic fairness and the liberal amendment policy under Federal Rule of Civil Procedure Rule 15(a)(2) would require that plaintiffs be given an opportunity to cure the defects, if they could, at least absent undue delay, bad faith, dilatory motive, or undue prejudice. See, *e.g., Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010); *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007). The Supreme Court's recent decisions in *Iqbal* and *Twombly* have created new uncertainties about the level of detail required in pleadings under the notice pleading regime of the Federal Rules of Civil Procedure. Circuit and district courts have not yet identified a clear boundary between what is sufficient and what is not. See, *e.g., Swanson v. Citibank N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (observing that courts are "still struggling" with "how much higher the Supreme Court meant to set the bar, when it decided not only *Twombly*, but also *Erickson v. Pardus*, 551 U.S. 89 (2007), and [*Iqbal*]," and noting that "[t]his is not an easy question to answer"); see also *Swanson*, 614 F.3d at 411 (Posner, J., dissenting in part) (noting the "opaque language" that the Supreme Court used to establish the "plausibility" requirement). As Professor Miller has suggested, "inconsistent rulings on virtually identical complaints may well be based on individual judges having quite different subjective views of what allegations are plausible." See Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules*

(continued...)

Though Vance and Ertel were never charged with, let alone convicted of, any crime, our precedents concerning the abuse of convicted criminals help guide our thinking about whether the alleged abuse violated a constitutional right. As the Supreme Court concluded recently, "[p]risoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (citations omitted); see also *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (concluding that the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures") (citations omitted). It is important to keep these fundamental concepts in mind as we focus on the claims before us. See *Forrest v. Prine*,

---

[11] (...continued)

*of Civil Procedure*, 60 Duke L. J. 1, 30-31 (2010) (describing "confusion and disarray among judges and lawyers" in applying *Iqbal*). Rule 1 instructs courts to construe the rules to secure the "just" determination of lawsuits, and there is a general policy in favor of allowing parties to have their cases decided on their merits. See, *e.g.*, *Swierkiewicz*, 534 U.S. at 514; *Christensen v. County of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). A reversal for inadequate pleading would require an opportunity to cure the defect unless it were clear that the defect could not be cured.

620 F.3d 739, 744 (7th Cir. 2010) (borrowing Eighth Amendment standards to analyze pre-trial detainee's claim).

Examining the plaintiffs' claims against the backdrop of the Supreme Court's decisions on prison conditions of confinement and prison treatment cases, we remember that abuse in American prisons was once authorized and even thought of as part of the punishment of prisoners. See, *e.g.*, *Hope v. Pelzer*, 536 U.S. 730 (2002) (detailing authorized state practice of chaining inmates to one another and to hitching posts in the hot sun); *Hutto v. Finney*, 437 U.S. 678, 682 nn. 4-5 (1978), citing *Talley v. Stephens*, 247 F. Supp. 683 (E.D. Ark. 1965) (describing the lashing of inmates with a "wooden-handled leather strap five feet long and four inches wide" as part of authorized corporal punishment program) and *Jackson v. Bishop*, 268 F. Supp. 804 (E.D. Ark. 1967) (describing the use of a "Tucker telephone," a hand-cranked instrument "used to administer electrical shocks to various sensitive parts of an inmate's body" in prison that authorized the use of a strap to punish prisoners), *remanded with orders for broader relief*, 404 F.2d 571 (8th Cir. 1968) (Blackmun, J.).

Today, the idea that a prisoner in a U.S. prison might be abused in such a manner and not have judicial recourse is unthinkable. While the Constitution "does not mandate comfortable prisons, . . . neither does it permit inhumane ones." *Farmer*, 511 U.S. at 832 (citations omitted) (noting that the Eighth Amendment requires that prison officials "ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee

the safety of the inmates' "). If a prisoner in a U.S. prison had his head covered and was repeatedly "walled," or slammed into walls on the way to interrogation sessions, we would have no trouble acknowledging that his well-pled allegations, if true, would describe a violation of his constitutional rights. See, *e.g.*, *Hudson v. McMillian*, 503 U.S. 1 (1992) (concluding that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment even where prisoner is not seriously injured).

If a prisoner was kept awake as much as possible, kept in insufferably cold conditions, and not given sufficient bedding or clothing, we would likewise believe that there could well have been a violation of his constitutional rights. See, *e.g.*, *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (clarifying that "[*s*]*ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise — for example, a low cell temperature at night combined with a failure to issue blankets"). If a U.S. prisoner with a serious medical condition is denied medical attention or has necessary medicine withheld, that too can violate the prisoner's constitutional rights. See *Estelle*, 429 U.S. at 104 (concluding that deliberate indifference to serious medical needs states a claim under the Eighth Amendment); *Board v. Farnham*, 394 F.3d 469, 480-81 (7th Cir. 2005) (holding that allegations of dental problems constitute objectively serious harm under the

Eighth Amendment). The plaintiffs in this case, detained without charges, have pled in detail allegations of such severe conditions and treatment, the likes of which courts have held unconstitutional when applied to convicted criminals in U.S. prisons. The allegations of abuse state claims for violations of the constitutional right not to be deprived of liberty without substantive due process of law.

2. *The Rights Were Clearly Established*

To decide qualified immunity, we turn next to whether the alleged rights were clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004), quoting *Saucier*, 533 U.S. at 202. The question is whether a reasonable official in Secretary Rumsfeld's position would have known that the conduct he allegedly authorized violated the Constitution of the United States.

This is not a case where the precise violation must have been previously held unlawful. Where the constitutional violation is patently obvious and the contours of the right sufficiently clear, a controlling case on point is not needed to defeat a defense of qualified immunity. See, *e.g., Hope*, 536 U.S. at 741 (reversing grant of qualified immunity for prison officials who chained a prisoner to a post for seven hours in the hot sun); *Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005). Given

the totality of the plaintiffs' allegations, that they were interrogated with physical violence and threats, were kept in extremely cold cells without adequate clothing, were continuously deprived of sleep, and were often deprived of food, clothing, and medical care, a reasonable official in Secretary Rumsfeld's position in 2006 would have known that this amounted to unconstitutional treatment of a civilian U.S. citizen detainee. See, *e.g.*, *Farmer*, 511 U.S. at 832; *Hudson*, 503 U.S. at 4; *Estelle*, 429 U.S. at 104. Lest there might have been any uncertainty on the point, Congress had twice recently and expressly provided as much as a matter of statutory law. See Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, 10 U.S.C. § 801, stat. note § 1092 (stating that U.S. military policy prohibits techniques that violate the Constitution and instructing Secretary of Defense to ensure that polices are consistent with international obligations and laws of the United States); Detainee Treatment Act, 10 U.S.C. § 801, stat. not. § 1002 (limiting interrogation techniques to those authorized in the Army Field Manual).

The defendants offer a final argument that the law was not sufficiently developed with respect to the treatment of detainees in the context of military detention for the plaintiffs to allege adequately the violation of a clearly established constitutional right by Secretary Rumsfeld. The defendants argue that the Supreme Court and appellate courts "have struggled, and continue to struggle, with the precise constitutional contours applicable to the detention of individuals — citizen and non-citizen alike — seized in a foreign war zone." On this point,

however, the defendants cite only cases involving proce-
dural due process claims: *Munaf v. Geren*, 553 U.S. 674
(2008), *Boumediene v. Bush*, 553 U.S. 723 (2008), and *Hamdi
v. Rumsfeld*, 542 U.S. 507 (2004). Those procedural issues
are undoubtedly difficult. But they shed no useful light
on how a reasonable federal official might have thought
that the Constitution permitted him to torture, or to
authorize the torture of, a civilian U.S. citizen. The defen-
dants themselves acknowledge that, if properly pled,
allegations of violations of substantive due process, the
likes of which the plaintiffs have raised, would amount
to a constitutional violation. In sum, a reasonable official
in Secretary Rumsfeld's position in 2006 would have
realized that the right of a United States citizen to be
free from torture at the hands of one's own govern-
ment was a "clearly established" constitutional right
and that the techniques alleged by plaintiffs add up to
torture. We affirm the district court's decision to deny
dismissal based on qualified immunity.

### C. *Bivens Claims by Civilian U.S. Citizens in a War Zone*

There can be no doubt that if a federal official, even
a military officer, tortured a prisoner in the United States,
the tortured prisoner could sue for damages under
*Bivens*. See *Carlson v. Green*, 446 U.S. 14 (1980) (allowing
*Bivens* claim against prison officials who were delib-
erately indifferent to prisoner's serious medical
needs); *Saucier*, 533 U.S. 194 (holding that military police
officer was entitled to qualified immunity on civilian's
*Bivens* claim for excessive force, without suggesting that

any broader immunity might apply). In this case, however, the defendants assert a broad immunity from suit under *Bivens*, claiming that civilian U.S. citizens can never pursue a *Bivens* action against any U.S. military personnel if the constitutional violations occurred in a war zone. We review this question of law de novo. See *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002); *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008).

The unprecedented breadth of defendants' argument should not be overlooked. The defendants contend that a *Bivens* remedy should not be available to U.S. citizens for any constitutional wrong, including torture and even cold-blooded murder, if the wrong occurs in a war zone. The defendants' theory would apply to any soldier or federal official, from the very top of the chain of command to the very bottom. We disagree and conclude that the plaintiffs may proceed with their *Bivens* claims.

We address first the nature of the *Bivens* remedy and then apply the two-step process the Supreme Court has applied for deciding when a *Bivens* remedy should be available. The first step is to consider whether there is a sufficient "alternative remedy" for the alleged constitutional wrong indicating that Congress has intended to supplant *Bivens*. Here there is no meaningful alternative, and the defendants do not argue otherwise. The second step is to consider whether "special factors" weigh against recognition of a *Bivens* remedy under the circumstances. In taking this second step, we explain that the key elements of plaintiffs' claims are well estab-

lished under *Bivens*: (a) that civilian claims against military personnel are permissible; (b) that claims based on abuse of prisoners are permissible; (c) that the Constitution governs the relationship between U.S. citizens and their government overseas; and (d) that claims against current and former cabinet officials are permitted. We then conclude that Congress has not indicated any bar to claims under these circumstances. In fact, Congress has acted to provide civil remedies to *aliens* who are tortured by *their* governments. It would be extraordinary to find that there is no such remedy for *U.S. citizens* tortured by *their own government*. In taking the second step, we then weigh and reject the defendants' arguments and authorities offered to support a special rule that would immunize government officials from *Bivens* liability for the torture, or worse, of a civilian U.S. citizen in a war zone.

Section 1 of the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, authorizes civil lawsuits against state and local government officials for the deprivation of federal constitutional and statutory rights. No analogous statute broadly authorizes similar suits against federal officials. The Supreme Court recognized in *Bivens*, however, that private citizens have an implied right of action directly under the Constitution to recover damages against federal officials for constitutional violations even where Congress has not conferred such a right by statute. In *Bivens*, the plaintiff sued federal law enforcement agents for searching his property without a warrant, using excessive force, and arresting him without probable cause. In holding that Bivens

was entitled to sue the agents for damages, the Supreme Court observed that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 U.S. at 392, quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946). "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Id*. at 395. The *Bivens* remedy has been designed to prevent constitutional rights from becoming "merely precatory." *Davis v. Passman*, 442 U.S. 228, 242 (1979) (holding that congressional employee could sue member of Congress for sex discrimination in employment in violation of equal protection branch of Fifth Amendment due process right).[12]

The Supreme Court's more recent *Bivens* decisions direct us to exercise caution in recognizing *Bivens* remedies in new contexts. *Bivens* does not provide an "automatic entitlement" to a remedy for a constitutional

---

[12] Long before *Bivens*, federal courts provided remedies for federal officials' violations of federal law, and individuals sought post-deprivation remedies against federal officials in federal court. See *Iqbal*, 129 S. Ct. at 1948, citing, *e.g.*, *Dunlop v. Munroe*, 11 U.S. (7 Cranch) 242, 268 (1812) (concluding, in case against postmaster, that a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178-79 (1804) (holding that commander of a warship was "answerable in damages" to the owner of a neutral vessel seized pursuant to orders from President but in violation of statute).

violation by a federal official, and "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). We have reminded plaintiffs that *Bivens* is not an automatic "gap-filler, available whenever a plaintiff seeks a particular remedy not provided for by any statute or regulation, for a constitutional violation by federal officers." *Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011); see also *United States v. Norwood*, 602 F.3d 830, 836 (7th Cir. 2010). Given this history, as well as the gravity of the claims before us, we "proceed cautiously" in determining whether to allow Vance and Ertel to pursue a cause of action under *Bivens*. See *Bagola v. Kindt*, 131 F.3d 632, 638 (7th Cir. 1997).[13]

The Supreme Court has developed a two-step test for structuring judgments about whether a particular *Bivens* claim should be recognized. First, courts must consider "whether any alternative, existing process for

---

[13] Some members of the Supreme Court have said that *Bivens* is outdated. *Wilkie*, 551 U.S. at 568 (Thomas, J., concurring); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring) (observing that "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action-decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition."). Despite this criticism, *Bivens* remains the law of the land, and it remains one vital way of ensuring that fundamental guarantees in the Bill of Rights are not hollow, precatory promises. *Wilkie* provides a helpful and recent guide for its application.

protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Where Congress has provided for an adequate alternative remedy, an implied *Bivens* remedy is neither necessary nor available. The Court has reached this conclusion in two cases where Congress has established comprehensive and well-defined civil remedies: Social Security benefits, in *Schweiker v. Chilicky*, 487 U.S. 412 (1988), and federal civil service employment, in *Bush v. Lucas*, 462 U.S. 367 (1983).

If there is no sufficient alternative, the courts must proceed to the second step of the *Bivens* test, as described in *Bush*: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Bush*, 462 U.S. at 378, quoted in *Wilkie*, 551 U.S. at 550.

1.  *Step One — Alternative Remedies*

The first step of the inquiry is to consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. The short answer is no. The defendants do not suggest that there is any alternative remedial scheme at all comparable to the Social Security procedures and remedies in *Schweiker* or the federal civil service pro-

cedures and remedies in *Bush*. While the defendants do not argue that there is an "alternative remedy," their "special factors" arguments invite us to look more broadly for indications of Congressional intent as to whether a *Bivens* action should be permitted under the circumstances. We do so below in our discussion of "special factors" in the second step.

Although the defendants do not argue that there is an "alternative remedy" for the plaintiffs, an amicus brief by former Secretaries of Defense and Members of the Joint Chiefs of Staff addresses the issue. They argue, as defendants do not, that Congress has created an elaborate and well-structured scheme for remedies and an administrative system that encourages detainees to make complaints. These amici suggest that Vance and Ertel enjoyed the protections of, among others, the Geneva Conventions, the Coalition of Provisional Authority Memorandum #3, and the Uniform Code of Military Justice. They argue that the plaintiffs are not entitled to pursue *Bivens* claims because they could have taken advantage of these protections by complaining about their treatment at the time of their detention.

We respect these amici and their distinguished public service. For three reasons, however, we are not persuaded by the argument that a *Bivens* remedy should be barred because detainees who are being tortured may submit a complaint about their treatment to the very people who are responsible for torturing them. First, if, as plaintiffs allege here, there was a problem stretching to the very top of the chain of command, it

would make little sense to limit their recourse to making complaints within that same chain of command. Second, the opportunity to complain offers no actual remedy to those in plaintiffs' position other than possibly to put a stop to the ongoing torture and abuse. A system that might impose discipline or criminal prosecution of the individuals responsible for their treatment does not offer the more familiar remedy of damages. Third, during oral argument, plaintiffs' counsel asserted that Vance and Ertel in fact did complain about their treatment while detained. At least one of the men had face-to-face conversations with the commander of Camp Cropper, who said there was nothing he could do about their treatment.[14]

---

[14] The panel invited this elaboration on the plaintiffs' complaint, as permitted on appeal of a Rule 12(b)(6) decision as long as the elaboration is not inconsistent with the complaint. See *supra* n. 6. The friends of the court refer to the applicable Army Regulation 190-8, which states that if civilian detainees are "not satisfied with the way the commander handles a complaint or request, they may submit it in writing." AR 190-8, § 6-9. The matter must be reported up the chain of command, investigated, and remedied under DoD Directive 5100.77 (Dec. 9, 1998). Def. Sec. Amicus Br. at 11. The amici note that at the time the plaintiffs were detained, there had been more than 800 investigations by military law enforcement officials of alleged detainee abuse. *Id*. at 13 n.8. We do not believe that this is the kind of comprehensive remedial system that would preclude a *Bivens* remedy. Apparently, neither does the government; its brief does not rely on this internal administrative complaint system.

The administrative remedy of inviting detainees to complain about their treatment is also nothing like the alternative remedies that the Supreme Court has found to preclude *Bivens* remedies in *Schweiker* and *Bush*. Those elaborate and comprehensive remedial systems provided meaningful safeguards and remedies established by Congress for victims of official wrongdoing. See *Schweiker*, 487 U.S. at 425. The situation before us is very different: Congress has not given civilian U.S. citizens claiming torture by U.S. officials in a war zone anything like the "frequent and intense" attention it has given the Social Security system and disability review. *Id*. It has not provided these plaintiffs any remedy. As we have concluded in other *Bivens* cases, "without an explicit indication from Congress, we will not foreclose this right when the statutory remedy is wholly inadequate." *Bagola*, 131 F.3d at 645. Here, there is no statutory remedy at all. We must proceed to step two of the *Bivens* inquiry.[15]

---

[15] Our dissenting colleague argues that we should leave the question of remedies entirely to Congress. Although we disagree, for reasons explained at length in the text, nothing in our reasoning would prevent Congress from addressing the problems posed here with a statutory solution. The *Bivens* line of cases shows that when Congress has acted to address the relevant context, as in Social Security and civil service cases, courts have been more than willing to defer to congressional solutions.

2. *Step Two — "Special Factors"*

The second step of the *Bivens* inquiry is to make "the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Bush*, 462 U.S. at 378, quoted in *Wilkie*, 551 U.S. at 550. We must be cautious in addressing the question, but we can draw sound guidance from many precedents addressing closely related problems. In considering this special factors analysis, we note first the breadth of the proposed defense and the narrowness of the asserted claim. We then turn to the *Bivens* precedents dealing with civilian claims against military personnel, those dealing with claims of abuse of prisoners, and then the more general principles that apply to the Bill of Rights outside of United States territory. We consider then the precedents and arguments relied upon by the defendants, including their invitation to consider Congressional intent in this area.

a. *The Scope of the Defense and the Claim*

The defendants' principal *Bivens* argument is that, because this case arose in a foreign war zone, no *Bivens* claim should be recognized. This sweeping defense is proposed against a fairly narrow claim. The defendants are arguing for a truly unprecedented degree of immunity from liability for grave constitutional wrongs committed against U.S. citizens. The defense theory

would immunize not only the Secretary of Defense but all personnel who actually carried out orders to torture a civilian U.S. citizen. The theory would immunize every enlisted soldier in the war zone and every officer in between. The defense theory would immunize them from civil liability for deliberate torture and even cold-blooded murder of civilian U.S. citizens. The United States courts, and the entire United States government, have never before thought that such immunity is needed for the military to carry out its missions.[16]

In asserting this broad defense, defendants have also sought to broaden plaintiffs' claims beyond those they are actually asserting. Contrary to the defense arguments, plaintiffs are not asserting a broad challenge to the detention or interrogation policies of the United States military. Plaintiffs assert that their treatment was

---

[16] We hope that the serious claims before us are truly unusual, but the defense theory is of particular concern because of our nation's increased reliance on civilian contractors in modern war zones. A majority of our nation's wartime presence in Iraq and Afghanistan has been made up of private contractors. The Congressional Research Service reported that, as of March 2011, the Department of Defense had more contractor personnel (155,000) than uniformed personnel (145,000) in Iraq and Afghanistan. In Iraq, as of March 2011, there were 64,253 Defense Department contractors and 45,660 uniformed personnel in the country. See "Department of Defense Contractors in Afghanistan and Iraq: Background and Analysis," Moshe Schwartz and Joyprada Swain, Congressional Research Service (May 13, 2011).

actually contrary to explicit statutory law and stated military policy, because they claim they were subjected to interrogation techniques that were not authorized by the applicable Army Field Manual. This case, in other words, does not invite a broad debate over appropriate detention and interrogation techniques in time of war. It presents factual issues over whether there was a deliberate decision to violate the U.S. Constitution and other applicable laws and, if so, who was responsible for that decision. With the broad scope of the proposed defense and the narrow focus of the asserted claim, we turn to precedent for guidance.

### b. *Precedents Supporting Plaintiffs' Claims*

The key elements of plaintiffs' claims for constitutional wrongs committed by military officials are all familiar in *Bivens* jurisprudence, and nothing about their claims would extend *Bivens* beyond its "core premise," which is "the deterrence of individual officers who commit unconstitutional acts." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001). That point does not end the "special factors" debate, but it provides a useful starting point.

First, of course, it is well established that *Bivens* is available to prisoners who assert that they have been abused or mistreated by their federal jailors. In *Carlson*, 446 U.S. 14, the Supreme Court reversed dismissal of a complaint in which a deceased prisoner's representative sued for violation of the Eighth Amendment prohibition on cruel and unusual punishment, in that case

through an alleged deliberate denial of needed medical care. Since *Carlson*, we have regularly allowed prisoners to pursue their constitutional challenges against federal prison officials as *Bivens* claims. See, *e.g.*, *Bagola*, 131 F.3d 632 (concluding that district court properly heard *Bivens* claim alleging injury as part of prison work program where workers' compensation program did not provide adequate safeguards to protect prisoner's Eighth Amendment rights); *Del Raine v. Williford*, 32 F.3d 1024 (7th Cir. 1994) (recognizing prisoner's *Bivens* claim alleging that he was forced to live in bitterly cold cell). The fact that the plaintiffs were imprisoned while not even charged with, let alone convicted of, any crime only tends to emphasize how familiar this aspect of their claim is.

Second, it is also well established under *Bivens* that civilians may sue military personnel who violate their constitutional rights. For example, *Saucier v. Katz*, 533 U.S. 194, an important but now overruled qualified immunity case, was a Fourth Amendment excessive force claim by a civilian against a military police officer. There was no suggestion that the civilian could not sue the military police officer. Circuit courts have also decided a number of *Bivens* cases brought by civilians against military personnel. See, *e.g.*, *Case v. Milewski*, 327 F.3d 564 (7th Cir. 2003) (civilian claim against military officers for Fourth and Fifth Amendment violations); *Morgan v. United States*, 323 F.3d 776 (9th Cir. 2003) (civilian claim against military police for search of vehicle); *Roman v. Townsend*, 224 F.3d 24 (1st Cir. 2000) (civilian claim against military police officer and Secretary of the

Army for improper arrest and treatment in detention); *Applewhite v. United States Air Force*, 995 F.2d 997 (10th Cir. 1993) (civilian claim against military investigators for unlawful search and removal from military base); see also *Willson v. Cagle*, 711 F. Supp. 1521, 1526 (N.D. Cal. 1988) (concluding that "a *Bivens* action may potentially lie against military officers and civilian employees of the military" for protesters injured when a military munitions train collided with them), *aff'd mem.*, 900 F.2d 263 (9th Cir. 1990) (affirming denial of qualified immunity); *Barrett v. United States*, 622 F. Supp. 574 (S.D.N.Y. 1985) (allowing civilian's *Bivens* claim to proceed against military officials for their alleged concealment of their role in the creation and administration of an army chemical warfare experiment in which her father unknowingly served as a test subject), *aff'd*, 798 F.2d 565 (2d Cir. 1986). While such claims often fail on the merits or for other reasons, the fact that a civilian has sued a military official is not a basis for denying relief under *Bivens*.[17]

---

[17] We are not persuaded by the defendants' reliance on *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), two cases in which the Supreme Court applied the "special factors" analysis to hold that one member of the U.S. Armed Forces could not sue another member of the Armed Forces under *Bivens*. Both decisions were based on the unique disciplinary structure within the military. Neither case provides a basis for rejecting a *Bivens* claim by a civilian against a military official.

Third, when civilian U.S. citizens leave the United States, they take with them their constitutional rights that protect them from their own government. In *Reid v. Covert*, 354 U.S. 1 (1957), the Supreme Court held that civilian members of military families could not be tried in courts-martial. Justice Black wrote for a plurality of four Justices:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government.

*Id.* at 5-6. The general proposition remains vital, as recently reaffirmed in *Boumediene*, holding that aliens held as combatants at Guantanamo Bay may invoke the writ of habeas corpus to challenge their detention: "Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'" 553 U.S. at 765, quoting *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885); see also *Munaf*, 553 U.S. at 688 (holding that civilian U.S. citizens held in U.S.

military custody in Iraq could seek petition for the writ of habeas corpus in federal district court). Cf. *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (holding that non-resident alien could not invoke Fourth Amendment to challenge search by U.S. officials in foreign country).

Fourth, defendant Rumsfeld is being sued for actions taken and decisions made while serving at the highest levels of the United States government. We express no view at this stage as to whether plaintiffs can prove their factual allegations. The former rank of the defendant, however, is not a basis for rejecting the plaintiffs' claims. The Supreme Court has repeatedly entertained *Bivens* actions against other cabinet members. See, *e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511 (1985) (holding that Attorney General was entitled to qualified immunity, not absolute immunity, from damages suit arising out of national security-related actions); *Harlow v. Fitzgerald*, 457 U.S. at 818 (concluding that senior aides and advisors of the President of the United States may be entitled to qualified immunity from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *Halperin v. Kissinger*, 606 F.2d 1192 (D.C. Cir. 1979) (concluding that senior Executive Branch officials, including a former president of the United States, were not absolutely immune from suit for damages by citizen alleging an unconstitutional wiretap), *aff'd in pertinent part*, 452 U.S. 713 (1981); *Butz v. Economou*, 438 U.S. 478 (1978) (concluding that federal officials in the Executive Branch, including the

Secretary of Agriculture, ordinarily may be entitled to qualified immunity, not absolute immunity, from constitutional claims).

c. *The Defense Arguments and Precedents for Special Factors*

Although the principal elements of plaintiffs' claims are familiar aspects of *Bivens* jurisprudence, the claims are challenging because they arose in a U.S. military prison in Iraq during a time of war. As the defendants acknowledged at oral argument, however, neither the Supreme Court nor any other federal circuit court has ever denied civilian U.S. citizens a civil remedy for their alleged torture by U.S. government officials.

i. *Military Affairs and National Security*

The defendants' argument that the courts should stay out of military affairs rests on the assumption that the plaintiffs are mounting a broad challenge to U.S. military and detention policy, raising issues of national security and even foreign relations. If plaintiffs were actually seeking a general review of "military actions and policies," as the defense suggests, this case would present different issues. That is not what plaintiffs seek. They are not challenging military policymaking and procedure generally, nor an ongoing military action. They challenge only their particular torture at the hands and direction of U.S. military officials, contrary to statutory provisions and stated military policy, as

well as the Constitution. Allowing *Bivens* liability in these unusual circumstances would not make courts, as defendants suggest, "the ultimate arbiters of U.S. military or foreign policy."

We are sensitive to the defendants' concerns that the judiciary should not interfere with military decision-making. The "Constitution recognizes that core strategic matters of warmaking" rest with the Executive. *Hamdi*, 542 U.S. at 531. But it is equally clear that "[w]hile we accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion necessarily is wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims." *Id*. at 535; see also *Ex parte Quirin*, 317 U.S. 1, 19 (1942) (acknowledging that "the duty which rests on the courts, in time of war as well as in time of peace, [is] to preserve unimpaired the constitutional safeguards of civil liberty"). Recognizing the plaintiffs' claims for such grave — and, we trust, such rare — constitutional wrongs by military officials, in a lawsuit to be heard well after the fact, should not impinge inappropriately on military decision-making.

The defendants raise the concern that litigation of the plaintiffs' claims "would inevitably require judicial intrusion into matters of national security." See *Wilson*, 535 F.3d at 710. This may be a serious concern, but at a very pragmatic level, the fact that classified informa-

tion (from years ago) might be implicated at some point in this litigation is not a bar to allowing it to go forward at this stage. If classified information becomes a problem, the law provides tools to deal with it. As Judge Calabresi explained in *Arar v. Ashcroft*, the state-secrets privilege is the appropriate tool by which state secrets are protected: "Denying a *Bivens* remedy because state secrets might be revealed is a bit like denying a criminal trial for fear that a juror might be intimidated: it allows a risk, that the law is already at great pains to eliminate, to negate entirely substantial rights and procedures." 585 F.3d at 635 (Calabresi, J., dissenting). As the majority in *Arar* acknowledged, "courts can — with difficulty and resourcefulness — consider state secrets and even reexamine judgments made in the foreign affairs context *when they must*, that is, when there is an unflagging duty to exercise our jurisdiction." *Id.* at 575-76. Fear of the judiciary "intruding" into national security should not prevent us from recognizing a remedy at this stage, in this case.

Courts reviewing claims of torture in violation of statutes such as the Detainee Treatment Act or in violation of the Fifth Amendment do not endanger the separation of powers, but instead reinforce the complementary roles played by the three branches of our government. See, *e.g.*, *Boumediene*, 553 U.S. at 742 ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches. This design serves not only to make Government accountable but also to secure individual liberty.");

see also *Hamdi*, 542 U.S. at 536-37 (emphasizing, with respect to challenges to the factual basis of a citizen's detention, that "it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to . . . his detention by his Government, simply because the Executive opposes making available such a challenge"). The defendants' broad argument that the judiciary should stay out of all matters implicating national security is too broad to be convincing.

Our dissenting colleague suggests that "given the significant pitfalls of judicial entanglement in military decisionmaking, it must be Congress, not the courts, that extends the remedy and defines its limits." Dissent at 88. We respectfully disagree. As the Supreme Court said in *Hamdi*: "Whatever power the United States Constitution envisions for the Executive . . . in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." 542 U.S. at 536.

Recent habeas corpus cases reinforce our understanding that federal courts have a role to play in safeguarding citizens' rights, even in times of war. The *Hamdi* Court, examining a claim by an American citizen detained on U.S. soil as an enemy combatant, held that the detainee was entitled to contest the basis for his detention. "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Hamdi*, 542 U.S. at 535, quoting *Sterling v. Constantin*, 287 U.S. 378, 401 (1932).

The *Munaf* Court later made clear that the habeas statute "extends to American citizens held overseas by American forces." *Munaf*, 553 U.S. at 680. Thus, courts may enforce the habeas rights of U.S. citizens in U.S. military custody in Iraq, though in *Munaf* itself, relief was denied because Iraq had a sovereign right to criminally prosecute the petitioners. *Id*. at 694-95.

Most recently, in *Boumediene*, the Supreme Court held that aliens detained as enemy combatants at Guantanamo Bay were entitled to seek a writ of habeas corpus to challenge their detention and that the Detainee Treatment Act review procedures were an inadequate alternative to habeas corpus. 553 U.S. at 795. This line of cases undermines the defendants' broad insistence that the judiciary must stay out of all matters concerning wartime detention and interrogation issues.[18]

---

[18] The defendants suggest that "it is telling" that the plaintiffs rely on habeas corpus cases rather than cases permitting *Bivens* claims in the context of reviewing military actions and policies, because habeas is a remedy authorized by statute and the Constitution while *Bivens* is merely a judicially-created remedy for damages, with what the defense argues is a presumption against recognizing claims in new contexts. The argument is not persuasive. Those cases also involve some judicial inquiry into matters affecting national security and military activity. *Hamdi*, *Munaf*, and *Boumediene* thus weigh against the argument that the courts must simply defer to executive authorities in a case involving alleged torture of a U.S. citizen in U.S. military custody.

The fact that the plaintiffs are U.S. citizens is a key consideration here as we weigh whether a *Bivens* action may proceed.[19] As the Court in *Reid* concluded: "When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." *Reid*, 354 U.S. at 6 (plurality opinion of Black, J.); see also *Kar v. Rumsfeld*, 580 F. Supp. 2d 80, 83 (D.D.C. 2008) (finding that the "Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq").

The defendants cite a number of cases, both habeas corpus and *Bivens* cases, for the proposition that the judiciary should not create damages remedies in the context of foreign affairs. Almost all of these were suits by aliens, not U.S. citizens, detained and suspected of terrorism ties. For example, the defendants cite *Arar v. Ashcroft*, where the sharply divided Second Circuit declined to recognize an alien's *Bivens* claim for "extra-

---

[19] This is not to say that we think that citizenship should be a dispositive factor in all *Bivens* cases implicating national security. But as we explain, in the context of this particular set of facts and allegations, U.S. citizenship or permanent resident alien status counsels in favor of recognizing a judicial remedy against federal officials even if the result might be different for an alien's similar claim. Such an alien could have his own government intervene to protect his rights, and such claims could implicate foreign affairs and diplomacy in a way that this case does not.

ordinary rendition" because several related "special factors" counseled hesitation. 585 F.3d at 575-81. The plaintiff in *Arar* was an alien with Syrian and Canadian citizenship who challenged an alleged U.S. presidential policy allowing extraordinary rendition and torture by foreign governments. The majority found that allowing the alien plaintiff to proceed with a *Bivens* claim "would have the natural tendency to affect diplomacy, foreign policy, and the security of the nation, and that fact counsels hesitation." *Id.* at 574. More recently, the D.C. Circuit held that Afghan and Iraqi citizens who alleged that they were tortured in U.S. custody in those nations could not pursue *Bivens* claims against U.S. officials, including Secretary Rumsfeld. *Ali v. Rumsfeld*, ___ F.3d ___, 2011 WL 2462851 (D.C. Cir. June 21, 2011).[20]

We are fully aware that prohibitions against torture are matters of international law as well as United States law, and that those prohibitions reflect basic and universal human rights. The question of remedies, however, has more room for nuance, and the Second Circuit majority in *Arar* was concerned in large part about the

---

[20] Our dissenting colleague contends that recognizing a *Bivens* claim here "vaults over this consensus" and "too-casually sidesteps the weight of precedent from other circuits." Dissent at 82, 88. There is in fact no such consensus to vault over, nor a "casual sidestep." There is no circuit court decision with which we disagree. The two circuits we have cited addressed the very different situation of alien detainees. The plaintiffs here are U.S. citizens entitled to the full protection of our Constitution.

diplomatic and foreign policy consequences of hearing Arar's claims. 585 F.3d at 574; see also *Arar*, 585 F.3d at 603 (Sack, J., concurring in part and dissenting in part) (concluding that security and secrecy concerns should not be considered "special factors counseling hesitation," but should be dealt with on a case-by-case basis employing the state-secrets doctrine). If the U.S. government harms citizens of other nations, they can turn to their home governments to stand up for their rights. These considerations are simply not present in this lawsuit by two U.S. citizens challenging their alleged illegal torture by their own government.

In a series of cases, the D.C. Circuit has rejected efforts by aliens to use *Bivens* to seek relief from U.S. foreign policy and military actions overseas. In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), members of the U.S. Congress and citizens of Nicaragua brought claims, including *Bivens* claims, against U.S. government officials for their alleged support of forces bearing arms in Nicaragua. In rejecting the obvious invitation to the federal courts to make foreign policy, the court explained: "we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." 770 F.2d at 209.

The D.C. Circuit followed that reasoning in *Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) (*Rasul II*), where the court relied on the alien citizenship of the plain-

tiffs in granting the defendants qualified immunity, finding that "[n]o reasonable government official would have been on notice that [alien] plaintiffs had any Fifth Amendment or Eighth Amendments rights." Because the *Rasul II* court found that the defendants were immune from suit, it reached the broader *Bivens* issue only in a footnote, concluding in the alternative that the plaintiffs' *Bivens* claims were foreclosed by "special factors." *Id*. at 532 n.5, citing Judge Brown's concurrence in *Rasul v. Myers*, 512 F.3d 644, 672-73 (*Rasul I*) (concluding that special factors foreclose a *Bivens* claim in the context of treatment and interrogation of enemy combatant detainees), *vacated*, 129 S. Ct. 763 (2008). In *Rasul I*, Judge Brown had written:

> Treatment of detainees is inexorably linked to our effort to prevail in the terrorists' war against us, including our ability to work with foreign governments in capturing and detaining known and potential terrorists. Judicial involvement in this delicate area could undermine these military and diplomatic efforts and lead to embarrassment of our government abroad.

512 F.3d at 673 (Brown, J., concurring) (quotation marks omitted); see also *Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 112 (D.D.C. 2010), *appeal pending*, No. 10-5393 (D.C. Cir.) (relying on *Rasul II*, finding that "[t]he D.C. Circuit's conclusion that special factors counsel against the judiciary's involvement in the treatment of detainees held at Guantanamo binds this Court and forecloses it from creating a *Bivens* remedy for plaintiffs here"). Judge

Brown's reasoning in *Rasul* cannot be extended to bar claims by U.S. citizens who have not been charged with, let alone convicted of, any terrorist activity.

Most recently, in *Ali v. Rumsfeld*, the D.C. Circuit followed *Rasul II* and *Sanchez-Espinoza* to hold that Iraqi and Afghan citizens detained abroad in U.S. military custody could not sue under *Bivens* for claims of torture. The court's analysis of "special factors" under *Bivens* emphasized the plaintiffs' status as aliens. ___ F.3d at ___, 2011 WL 2462851, at *4-7. The D.C. Circuit's opinions in *Ali*, *Rasul II*, and *Sanchez-Espinoza* do not even hint that their reasoning would extend to bar *Bivens* claims by civilian U.S. citizens who can prove that their own government tortured them.

As our dissenting colleague points out, there is some overlap in the special factors analysis that applied in the cases brought by aliens in *Ali* and *Arar*, all of whom alleged they were tortured, either directly by the U.S. government or as a result of a U.S. practice of extraordinary rendition. Those cases presented very disturbing allegations about our government, especially in view of our nation's long commitment to comply with international law and our leadership in opposing torture worldwide. We acknowledge that those cases presented difficult issues in applying the *Bivens* special factors analysis.

Whether one agrees or disagrees with *Ali* and *Arar*, however, we should not let the difficulty of those cases lead us to lose sight of the fundamentally different situation posed by the claims of civilian U.S. citizens in this case. These plaintiffs have alleged a grave breach of our

most basic social compact — between "We the People" and the government we created in our Constitution. As difficult as torture claims by aliens may be, we repeat that nothing in *Ali* or *Arar*, or in the opinions in *Rasul II* or *Sanchez-Espinoza*, indicates that those courts were willing to extend the unprecedented immunity that defendants and the dissent advocate here, for claims that our government tortured its own citizens.

ii. *Congressional Intent*

The defendants do not argue that Congress has created an "alternative remedy" that forecloses a *Bivens* remedy. They argue, though, that because Congress has passed numerous pieces of legislation regarding detainee treatment, none of which provide detainees with a statutory private right of action, the courts should not recognize a *Bivens* remedy for civilian U.S. citizens tortured in military custody in a war zone. See, *e.g.*, Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, 10 U.S.C. § 801, stat. note § 1092; Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2635, codified at 28 U.S.C. § 2241(e)(2). Congress has also addressed detention standards in a criminal statute without providing for a private civil right of action. See 10 U.S.C. § 893 (a person guilty of cruelty and maltreatment of person subject to his orders shall be punished as a court-martial may direct). Congress has even gone so far as to criminalize overseas torture, see 18 U.S.C. § 2340A, but explicitly provided that it was not creating a new civil right of action. See 18 U.S.C.

§ 2340B ("Nothing in this chapter shall be construed . . . as creating any substantive or procedural right enforceable by law by any party in any civil proceeding."). From Congress' close attention to detainee treatment without creating a civil right of action, defendants infer that a *Bivens* remedy is not appropriate here.

We disagree. *Bivens* is a well-known part of the legal landscape, so it is significant that Congress has taken no steps to foreclose a citizen's use of *Bivens*. We can assume that Congress was aware that *Bivens* might apply when it enacted legislation relevant to detainee treatment. In fact, when Congress enacted the Detainee Treatment Act, it opted to regulate — not prohibit — civil damages claims against military officials accused of torturing aliens suspected of terrorism. Congress created a good faith defense in civil and criminal cases for officials who believed that their actions were legal and authorized by the U.S. government:

> In any civil action or criminal prosecution against an officer, employee, member of the Armed Forces, or other agent of the United States Government [for engaging in practices involving detention and interrogation of alien detainees suspected of terrorism] it shall be a defense that such officer, employee, member of the Armed Forces, or other agent did not know that the practices were unlawful and a person of ordinary sense and understanding would not know the practices were unlawful . . . . Nothing in this section shall be construed to limit or extinguish any defense or protection otherwise

available to any person or entity from suit, civil or criminal liability, or damages, or to provide immunity from prosecution for any criminal offense by the proper authorities.

42 U.S.C. § 2000dd-1(a).[21] This express but limited defense against civil claims by *alien* detainees suspected of terrorism is a strong indication that Congress has not closed the door on judicial remedies that are "otherwise available," certainly for *U.S. citizens*, even though it chose not to wrestle with just what those remedies might be.

Accepting defendants' invitation to consider other indications of Congressional intent, we find other powerful evidence that weighs heavily in favor of recognizing a judicial remedy here. Congress has enacted laws that provide civil remedies under U.S. law for foreign citizens who are tortured by their governments. The plaintiffs cite the Torture Victim Protection Act and the Alien Tort Statute, 28 U.S.C. § 1350, which was part of the Judiciary Act of 1789, to show that "Congress and the American people have always stood against torture, and Congress has seen litigation against officials of other nations as an important tool to implement America's foreign policy against torture." Pl. Br. at 30. Where Congress has authorized such claims by noncitizen victims of torture by foreign governments, it

---

[21] The defendants emphasize the last sentence in the quoted passage, but it indicates only that Congress did not intend to make any other change in law that would otherwise apply.

would be startling if United States law did not provide a judicial remedy for U.S. citizens alleging torture by their own government.

It would be difficult to reconcile the law of nations' prohibition against torture and the remedies United States law provides to aliens tortured by their governments with a decision not to provide these citizen-plaintiffs a civil remedy if they can prove their allegations. The defendants have not attempted to do so. As the Second Circuit held in *Filartiga v. Pena-Irala*, "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties." 630 F.2d 876, 878 (1980) (holding that alien victims of torture in Paraguay could sue responsible Paraguayan official in U.S. district court under Alien Tort Statute for damages for violation of law of nations); see also *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (describing the history of the Alien Tort Statute and holding that district courts may recognize private causes of action for some violations of the law of nations).

Most relevant, though, is the Torture Victim Protection Act of 1991, Pub. L. 102-256, codified as a note to the Alien Tort Statute, 28 U.S.C. § 1350. Section 2(a) of that Act provides a cause of action for civil damages against a person who, "under actual or apparent authority, or color of law, of any foreign nation," subjects another person to torture or extrajudicial killing. Section 2(b) requires U.S. courts to decline to hear such claims "if the claimant has not exhausted adequate and available

remedies in the place" where the conduct occurred. Under the Torture Victim Protection Act, if an alien has been tortured by her own government, and if that foreign government has denied her a civil remedy, then a U.S. court could hear the case against a defendant found in the U.S. It would be extraordinary — one might even say hypocritical — for the United States to refuse to hear similar claims by a U.S. citizen against officials of his own government. And *Bivens* provides the only available remedy.

To illustrate the anomalous result the defendants seek, consider the possibility that another country has enacted its own law identical to the U.S. Torture Victim Protection Act. If we accepted defendants' argument in this case and held there is no civil remedy available, then there would be no "adequate and available remedies in the place" where the conduct occurred (a U.S. military base). If Secretary Rumsfeld could be found visiting such a country with its own TVPA (so he could be served with process), Vance and Ertel could sue him in that country under its torture victim protection law because U.S. law would provide no remedy. That would be a very odd result. Surely the Congress that enacted the Torture Victim Protection Act would rather have such claims against U.S. officials heard in U.S. courts.[22]

---

[22] Other parts of our government seem to agree, as Judge Parker pointed out in *Arar*, 585 F.3d at 619 (Parker, J., dissenting). The U.S. State Department has assured the United Nations Committee Against Torture that the *Bivens* remedy is available to victims of torture by federal officials. United States

(continued...)

In sum, we are not convinced by the defendants' argument that "special factors" preclude recognition of a *Bivens* remedy in this case. A couple of final concerns remain in our *Bivens* analysis. The defendants argue that, under the plaintiffs' approach, any military action could result in a *Bivens* claim if the action were characterized as a violation of some government policy. The defendants argue, for example, that this could include a plaintiff seeking damages from the Secretary of Defense for an air strike in a location beyond the bounds of congressional authorization to wage war. The argument is not convincing. Today we decide only the narrow question presented by the extraordinary allegations now before us. The *Bivens* case law weighs in favor of allowing plaintiffs, U.S. citizens, to proceed with their claims that while they were in U.S. military custody, they were *tortured* by U.S. government officials. Our decision today opens up the courts to other claims like this, but we hope and expect that allegations of this nature will be exceedingly rare. We make no broader holding about whether other future claims about violations of government policy would be cognizable under *Bivens*.

---

[22] (...continued)

Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006), available at http://www.state.gov/g/drl/rls/68554.htm (last accessed Aug. 4, 2011). This answer was in response to a question about the fact that the only legislation the United States had enacted to give effect to the Convention Against Torture gave U.S. courts criminal jurisdiction over only extraterritorial acts of torture.

A difficult related question is whether recognizing the plaintiffs' *Bivens* claim in this instance creates a special category of constitutional rights that would still be enforceable in a war zone and, if so, what the limits are of such a category. While the plaintiffs are arguing, for example, that Fifth Amendment substantive due process rights apply to U.S. citizens detained by the U.S. military in a war zone, this appeal presents no issue regarding the fact of plaintiffs' detention or some aspects of that detention that would not have passed constitutional muster if the detention had been subject to civilian processes in the United States.[23]

The amicus brief by the Society of Professional Journalists, the Project on Government Oversight, and the Government Accountability Project in support of the plaintiffs also raises important questions about what remedies U.S. citizen-journalists have in war zones. The concerns of these amici were manifest in *Kar*. In that case, a U.S. citizen alleges that he went to Iraq to make a historical documentary film, was arrested by Iraqi authorities, and then was transferred to U.S. authorities and detained at Camp Cropper for two months. Although recognizing that the Fourth and Fifth Amend-

---

[23] The district court dismissed the plaintiffs' Counts II and III. In Count II, plaintiffs claimed that they were denied procedural due process, specifically through the denial of a factual basis for their detention, access to exculpatory evidence, and the opportunity to appear before an impartial adjudicator. In Count III, the plaintiffs contended that they were denied access to a court of law to challenge their detention. These claims are not before us.

ments "certainly protect U.S. citizens detained in the course of hostilities in Iraq," see 580 F. Supp. 2d at 83, the district judge found that the defendants had not violated any clearly established constitutional rights:

> As weak as the government's authority is, Kar has provided none at all — no precedent that clearly establishes the right of a U.S. citizen to a prompt probable cause hearing when detained in a war zone. Any attempt to apply the two-day requirement from [*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)] or the seven-day requirement from the Patriot Act to Kar's circumstances ignores the differences between detention on U.S. soil and detention in hostile territory.

*Id*. at 85. We are inclined to agree with that observation, and indeed, many broader questions remain about the application in a war zone of constitutional safeguards we have developed over time to protect U.S. citizens' rights.[24] There may be difficult questions ahead, but our job is to deal with those questions. We should not let the prospect of difficult questions in the future cause us to close the courthouse doors to the serious claims presented by these allegations.

In rejecting the defendants' "special factors" arguments for a complete and unprecedented civil immunity for torture of U.S. citizens, we have tried to apply the caution required in applying *Bivens*. But caution is also

---

[24] For a thoughtful discussion of some of these issues, see José A. Cabranes, *Our Imperial Criminal Procedure: Problems in the Extraterritorial Application of U.S. Constitutional Law*, 118 Yale L.J. 1660 (2009).

required from the opposing perspective. Our courts have a long history — more than 200 years — of providing damages remedies for those whose rights are violated by our government, including our military. See *Iqbal*, 129 S. Ct. at 1948, citing *Dunlop v. Munroe*, 11 U.S. (7 Cranch) 242, 268 (1812) (in case against postmaster, federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Bivens*, 403 U.S. at 395-97 (collecting cases showing that damages against government officials are historically the remedy for invasion of personal interests in liberty, and quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803): "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."); *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178-79 (1804) (holding that commander of a warship was "answerable in damages" to the owner of a neutral vessel seized pursuant to orders from President but in violation of statute).

If we were to accept the defendants' invitation to recognize the broad and unprecedented immunity they seek, then the judicial branch — which is charged with enforcing constitutional rights — would be leaving our citizens defenseless to serious abuse or worse by another branch of their own government. We recognize that wrongdoers in the military would still be subject to criminal prosecution within the military itself. Relying solely on the military to police its own treatment of civilians, however, would amount to an extraordinary abdication of our government's checks and balances that preserve Ameri-

cans' liberty. The district court correctly allowed plaintiffs to proceed with their *Bivens* claims for torture.

D. *Military Authority Exception to the Administrative Procedure Act (APA)*

Finally, we turn to the plaintiffs' claim against the United States to recover personal property seized from them by the U.S. military when they were detained.[25] The question is whether the "military authority" exception in the Administrative Procedure Act, which prohibits judicial review of "military authority exercised in the field in time of war or in occupied territory," 5 U.S.C. § 701(b)(1)(G), precludes subject matter jurisdiction over the plaintiffs' claim. We review this question of law de novo. See *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002). We conclude that the "military authority" exception precludes judicial review and reverse the district court's decision on this claim.

The "military authority" exception to the Administrative Procedure Act provides that the right of judicial review for persons aggrieved by government actions does not extend to the exercise of military authority "in

---

[25] Vance has been able to recover his laptop computer from military officials, who recovered it from a search of an Army Criminal Investigative Command evidence facility at Camp Victory in Iraq, but plaintiffs are still missing other personal items seized when they were detained.

the field in time of war." 5 U.S.C. §701(b)(1)(G). The plain language of the statutory exception prevents the court from reviewing military decisions regarding these plaintiffs' personal property. First, there is no question that the seizure of plaintiffs' property was an exercise of "military authority" by U.S. military personnel stationed in Iraq. Vance and Ertel acknowledge that their property was taken by members of the military in connection with a military investigation. Second, the confiscation of property occurred "in time of war." The alleged seizure of the property occurred in 2006 in the midst of a congressionally-authorized war in Iraq. See Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 (2002); *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 102 (D.D.C. 2007) (taking judicial notice that the United States is at war in Iraq); *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 283-84 (D.D.C. 2005) (recognizing that the United States was at war in Iraq). Third, the military personnel seized plaintiffs' property "in the field." When their property was seized, Vance and Ertel were in Baghdad during an armed conflict. See, *e.g.*, *Rasul v. Bush*, 215 F. Supp. 2d 55, 64 n. 11 (D.D.C. 2002) (concluding that the military authority exception would bar relief under the APA because plaintiffs were captured in areas where the United States was "engaged in military hostilities pursuant to the Joint Resolution of Congress"), *aff'd*, *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), *rev'd on other grounds*, *Rasul v. Bush*, 542 U.S. 466 (2004); *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991) (suggesting that the exception applies

to "military commands made in combat zones or in preparation for, or in the aftermath of, battle").

The district court relied on *Jaffee v. United States*, 592 F.2d 712 (3d Cir. 1979), to distinguish between a claim for the return of property and a challenge to the initial seizure of property. We find *Jaffee* inapposite. There, in a case that did not address recovery of personal property, the plaintiff sued under the APA to challenge the government's failure to take remedial measures to protect soldiers who were exposed to an atomic explosion at a military base in Nevada. The court held that the "military authority" exception did not apply because the army's failure to act was "neither in the field nor in time of war." *Id*. at 720. The atomic blast occurred during the Korean conflict, but thousands of miles of land and ocean separated the blast site in Nevada from the active combat zone in Korea. These facts are readily distinguishable from those before us, where Vance and Ertel's property was allegedly seized from them in the middle of a war zone. Furthermore, while the *Jaffee* plaintiffs sought relief for the government's failure to act years after the Korean War had officially ended, Vance and Ertel, by contrast, seek an inquiry into the whereabouts of their property while the conflict in Iraq is ongoing.

The district judge denied the motion to dismiss based on the possibility that the plaintiffs' property might no longer be held "in the field," and allowed the claim to proceed to permit discovery to inquire into its present location. We do not find this reasoning persuasive. The

cases cited by the district court to support this reasoning are all readily distinguishable. See, *e.g.*, *Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 129 (D.D.C. 2003) (finding that the "military authority" exception did not prevent judicial review of a decision to require American troops stationed within the United States to submit to anthrax vaccinations because claims did not challenge "military authority exercised in the field in a time of war or in occupied territory"); *Rosner v. United States*, 231 F. Supp. 2d 1202, 1217-18 (S.D. Fla. 2002) (allowing, in "an abundance of caution," discovery on the application of the "military authority" exception to the United States Army's seizure of property expropriated by the Hungarian government during World War II). In contrast to these cases, it is clear that Vance and Ertel's personal property was seized by "military authority exercised in the field in time of war." 5 U.S.C. §701(b)(1)(G).

Regardless of the current location of the property — whether in Fort Hood, Texas, or in Rock Island, Illinois, as plaintiffs suggest, or in Baghdad — it was seized by and remains in the custody of military engaged in ongoing hostilities in Iraq. While in some cases it may be appropriate for the district court to order discovery to determine whether the "military authority" exception applies, no additional discovery is necessary on this issue here where the exception clearly applies as the claims have been pled.

III. *Conclusion*

The decision of the district court in No. 10-1687 denying in part Secretary Rumsfeld's motion to dis-

miss is AFFIRMED. The decision in No. 10-2442 denying dismissal of the personal property claims under the Administrative Procedure Act is REVERSED.

MANION, *Circuit Judge*, concurring in part and dissenting in part.  Much attention will be focused on the fact that the court has sustained a complaint alleging that former-Secretary Rumsfeld was personally responsible for the torture of United States citizens. However, the most significant impact of the court's holding is its extension of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Specifically, the court holds that a "*Bivens* remedy," as implied causes of action for violations of constitutional rights have come to be known, is available to United States citizens alleging torture while held in an American military prison in an active war zone. Present case law requires a very cautious approach before extending a *Bivens* remedy into any new context, and emphasizes that there are many "special factors" present in this particular context that should cause us to hesitate and wait for Congress to act. Because the court has not exercised that restraint in this case, I respectfully dissent.

For starters, this case is not about constitutional rights, against torture or otherwise—the defendants readily acknowledge that the type of abuse alleged by the plaintiffs would raise serious constitutional issues. Rather, this case centers on the appropriate *remedies* for that abuse and who must decide what those remedies will be. Confronted by allegations as horrible as those described in this case, it is understandable that the court concludes that there *must* be a remedy for these plaintiffs. But that concern should not enable this court to create new law. For decades, the Supreme Court has cautioned that such decisions should be left to Congress, especially where there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007); *see also, e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412, 421-23 (1988) (refusing a cause of action of social security complaints); *United States v. Stanley*, 483 U.S. 669, 680-81 (1987) (no cause of action by military service member when the injury arise out of activity incident to service). This longstanding reluctance creates a veritable presumption *against* recognizing additional implied causes of action. In line with this presumption, both circuits confronted with allegations of constitutional violations in war zones have refused to recognize a *Bivens* remedy. *See Ali v. Rumsfeld*, ___ F.3d ___, 2011 WL 2462851, at *6 (D.C. Cir. Jun. 21, 2011); *Arar v. Ashcroft*, 585 F.3d 559, 635 (2d Cir. 2009). The court vaults over this consensus and, for the first time ever, recognizes a *Bivens* cause of action for suits alleging constitutional violations by military personnel in an active war zone.

I dissent because sorting out the appropriate remedies in this complex and perilous arena is Congress's role, not the courts'.[1]

Before explaining the particulars of my disagreement with the court, it is important to stress the proper questions before the court. Otherwise, given the severity of the allegations and the controversy surrounding the military policies underlying this case, we risk getting sidetracked. What we are asked to decide is simply who—the courts or Congress—should decide whether the courts will review constitutional claims against military personnel that arise in an active war zone, under what conditions and parameters that review should take place, and to what extent members of the military, whether high or low, should have immunity from suit.[2] Whether there *should* be judicial review of these claims is a policy question, one that I believe is outside the purview of this court to decide.

---

[1] I concur, however, in the court's dismissal of the plaintiffs' property claims pursuant to the military authority exception to the Administrative Procedure Act.

[2] The court's rhetorical dissection of "immunity" obscures, rather than clarifies, an already complex and confusing issue. Whether a *Bivens* remedy is available and whether particular federal officials are entitled to either absolute or qualified immunity are entirely distinct questions. "Immunity" is indeed an issue elsewhere in this suit, *see infra* note 5, but primarily the issue before us is whether or not there is an implied *Bivens* cause of action directly under the Constitution.

The Supreme Court refined its cautious approach to this question in *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). There, it adopted a two-part test to determine whether to extend implied actions into a new context. First, if there are adequate alternative remedies, there is no need for an implied *Bivens* remedy. And second, if there are "special factors counseling hesitation," courts should leave the creation of new remedies to Congress, which is after all "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." *Id.* at 550, 562. The court focuses most of its attention on the "special factors" prong of the test. I will follow suit and assume for the sake of argument that the first prong is satisfied and no meaningful alternative remedy exists in statute or regulation.[3] I think it clear that there are special factors and precedents that should control this case. The court holds otherwise, but I would point to what I see as the five defects in the court's holding: (1) the lack of precedent in its favor; (2) the underestimation of the risks of judicial review of wartime military activity; (3) its unsuccessful attempt to distinguish precedent from other circuits; (4) the inapplicability of recent habeas corpus jurisprudence; and finally (5) the failure to

---

[3] A distinguished collection of fourteen former Secretaries of Defense and Members of the Joint Chiefs of Staff filed an amicus brief urging us to wait for Congress to decide how to handle alleged constitutional violations by military personnel. They make a strong case that there are adequate alternative remedies that the plaintiffs have not pursued, contrary to the court's conclusion.

recognize the consequences of its holding and the precedent it sets.

The resolution of the special factors analysis is straightforward. If anything qualifies as a "special factor[] counseling hesitation," it is the risk of the judiciary prying into matters of national security or disrupting the military's efficient execution of a war. National security matters are "rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981), and "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). In that arena, courts will necessarily have to pass judgment on sensitive matters of military policy, including who is (or should be) responsible for making and implementing that policy at various levels. Further, judicial review of wartime decisions will necessarily involve significant amounts of classified materials, generating public discussion of sensitive matters of national security in open court. The commonsense understanding that the courts should exercise caution before venturing out into the battlefield is reflected in the limited precedent to date. While the Supreme Court has not taken up the question of *Bivens* in the context of wartime military actions, the D.C. Circuit and the *en banc* Second Circuit have both concluded that *Bivens* should not extend to suits by wartime detainees. *See Ali*, ___ F.3d ___, 2011 WL 2462851, at *6; *Arar*, 585 F.3d 559. We should follow our sister circuits in leaving for Congress the task of addressing the "who," "what," "when," "where," "why," and "how much" questions of civil damages remedies for military decisions

in wartime, rather than exploring an uncharted maze of military and national security policy in a foreign war zone.

The court's citations seem to acknowledge this lack of precedent. All of the cases it cites in its favor addresses different contexts and different special factors. It approaches the "special factors" analysis in this case by arguing that the military detainee context is not that much different from other contexts in which *Bivens* actions have been allowed. But these cases are largely beside the point, because they do not concern the legitimate special factors of national security and military policy at play in this case. The court points out precedent that *Bivens* claims have long been "available to prisoners who assert that they have been abused or mistreated by their federal jailors," *see, e.g.*, *Carlson v. Green*, 446 U.S. 14 (1980); (Opn. at 53) that the Supreme Court, this court, and others have allowed *Bivens* claims to continue against military officials, *Saucier v. Katz*, 533 U.S. 194 (2001), and even cabinet members, *Mitchell v. Forsyth*, 472 U.S. 511 (1985).[4] These cases do establish that a *Bivens* remedy may lie against

---

[4] The court also correctly notes that United States citizens do not lose their constitutional rights when they venture abroad. I stress again that the lack of an implied cause of action under *Bivens* does not strip plaintiffs here of their constitutional rights (against torture or anything else) in a war zone; it merely forces Congress to sort out a difficult issue. Moreover, the court's citations involve military trials for civilians and habeas corpus rights for citizens, and have nothing to do with liability under *Bivens* (or any other cause of action). (Opn. at 56)

military personnel—and even their cabinet-level superiors—in a domestic setting. But because none of them involved claims arising abroad or during war, they do not provide any guidance to the issue at the heart of this case. Namely, whether judicial review of actions undertaken by the military in an active foreign war zone raises special factors that should caution us to hesitate and allow Congress to create an appropriate cause of action.

Second, the court understates the difficulties that inhere in judicial review of military activity in a time of war. While it does acknowledge the issue, the court does not appear to appreciate just how much judicial review might intrude on difficult and sensitive matters. The court argues—as did Judge Calabresi in his dissenting opinion in *Arar*—that the state secret privilege is all the protection we need to safeguard confidential matters of national security from compromise in open court. *See Arar*, 585 F.3d at 635 (Calabresi, J. dissenting). But sorting out claims of privilege would itself entail significant judicial intrusion in national security affairs, and Congress is in a much better position to balance the competing needs for national security and the vindication of citizens' constitutional rights. The court also stresses that the judicial scrutiny in this and other cases will be "well after the fact" and "should not impinge inappropriately on military decision-making." (Opn. at 59) But it should go without saying that the existence of a civil damage remedy years down the line may affect decisions

being made on the same battlefield today, by the same or similarly situated individuals. That is not to say that some judicial review in this area may not be necessary—I agree with the court that allegations of torture against a U.S. citizen are a very serious matter. But given the significant pitfalls of judicial entanglement in military decisionmaking, it must be Congress, not the courts, that extends the remedy and defines its limits.

Third, the court too-casually sidesteps the weight of precedent from other circuits that *Bivens* should not be extended to suits against military officials for wartime actions. *See Ali*, ___ F.3d ___, 2011 WL 2462851, at *6; *Arar*, 585 F.3d 559. It does this by pointing out that those cases involved aliens, rather than citizens. But the foreign status of the plaintiffs and potential foreign policy implications were hardly the only special factors at play in those decisions. In its e*n banc* decision refusing to recognize a *Bivens* remedy, the Second Circuit also listed three other special factors: national security interests, confidential information, and the risks posed by proceedings in open court. *Arar*, 585 F.3d at 575, 576-77. And the D.C. Circuit has consistently referred to the risk of "obstructing national security policy" and has recently stressed that "allowing a *Bivens* action to be brought against American military officials engaged in war would disrupt and hinder the ability of our armed forces to act decisively and without hesitation in defense of our liberty and national interests." *Ali*, ___ F.3d at ___, 2011 WL 2462851, at *6; *see also Rasul v. Myers*, 563 F.3d

527, 532 n.4 (D.C. Cir. 2009) (*Rasul II*) (internal quotes omitted).[5]

Fourth, the court cites recent Supreme Court habeas corpus cases approving limited judicial oversight over military detention decisions, but these are clearly inapposite. The defendants cogently object that the fact that Congress has permitted the limited relief of habeas corpus actions—essentially equitable relief—says next to nothing about whether the courts should give the green light to a much broader implied cause of action for money damages. To this, the court responds that "those [habeas] cases also involve some judicial inquiry into matters affecting national security and military activity," and therefore "weigh against the argument that the courts must simply defer to executive authorities in a case involving alleged torture of a U.S citizen in U.S. military custody." (Opn. at 62 n.18) This rejoinder misses the point entirely, however. I emphasize once again

---

[5] The court also distinguishes *Rasul II* because it involved detainees who were known or potential terrorists, whereas here the plaintiffs "have not been charged with, let alone convicted of, any terrorist activity." (Opn. at 67) But the plaintiffs were obviously considered a security threat when they were first apprehended; why should the fact that the military eventually concluded otherwise be relevant to the *Bivens* special factor analysis? Instead, it highlights why the court should not be picking and choosing between various constitutional tort claims based on "countervailing factors that might counsel alacrity or activism," which have never been a part of the *Bivens* special factors analysis. *Arar*, 585 F.3d at 573-74.

that it is not a question of deferring to *executive* authority, but to *Congress*. And the question is not whether the courts are competent to review military decisions, nor even whether such review would be necessary or wise. The only question before us is whether these complex questions of military efficiency, national security, and separation of powers constitute "special factors counseling hesitation." Clearly they do, and therefore Supreme Court precedent dictates that these sensitive questions be left for Congress to resolve through the creation (or not) of a cause of action for civil remedies.

Finally, the court does not recognize the far-reaching implications of its holding. It stresses that its holding is limited to "the narrow question presented by the extraordinary allegations now before us." (Opn. at 73) That is, the remedy extends (at least for now) only to U.S. citizens who are tortured—and perhaps to other, nebulous "core constitutional rights"—while in U.S. military custody in a war zone. The court offers no logical reason why its unprecedented holding that a *Bivens* remedy is available for allegations of torture by military personnel in an active war zone should not extend to other constitutional violations. Instead, the court labels such concerns "not convincing." (Opn. at 73) But claims similar to those before us could certainly proliferate based on this precedent. Given the enormous numbers of civilian contractors working in the current foreign war zones (a fact to which the court itself alludes), the potential scope of the court's *Bivens* remedy is itself a special factor that should cause

us to hesitate before taking this first step. Unfortunately, fraud and corruption among American workers in a war zone is not rare. These and common crimes of robbery and assault can land an American civilian in the brig under military supervision. The voluminous litigation by prisoners in our domestic prisons evidence the possibility of "well pleaded complaints" under the *Bivens* framework by Americans who claim torture and other cruel and unusual treatment while being held in a military prison in a war zone. Which of the potentially thousands of wartime claims from American employees of contractors (or others) will the court entertain under this new cause of action? Future courts should not have to put the lid back on Pandora's Box.

For these reasons, I dissent from the court's decision to allow the plaintiffs constitutional claims to proceed.[6]

---

[6] I also have serious reservations about other aspects of the court's opinion, especially its holding that Secretary Rumsfeld may be held personally liable for the alleged actions of his subordinates under the plaintiffs' allegations. The court identifies two alleged bases for Secretary Rumsfeld's personal responsibility—his actual authorization of abusive interrogation techniques at the time plaintiffs allege they were tortured, and his deliberate indifference in the face of knowledge of ongoing abusive treatment of detainees, including Americans. The first set of allegations is entirely speculative. The purported basis is a single article in the New York Times that does not actually support the plaintiffs' claims that Secretary Rumsfeld

(continued...)

I concur with the court's dismissal of plaintiffs' Administrative Procedure Act claims.

---

[6] (...continued)
approved the continued use of the techniques in question via confidential addendum to the Army Field Manual. The article states neither that the confidential addendum approved the techniques, nor that the addendum was ever approved. The second set of allegations may have greater plausibility, but the court's opinion does not explain why the predicates for deliberate indifference in the military context (far removed from the usual prison context) are sufficiently clearly established as to defeat qualified immunity.

---